**Application of Nathaniel GRIER.**

**Patent Appeal No. 7258.**

United States Court of Customs
and Patent Appeals.

March 11, 1965.

Joseph Hirschmann, New York City, for appellant.

Clarence W. Moore, Washington, D. C. (Fred W. Sherling, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

Nathaniel Grier appeals from a decision of the Board of Appeals affirming the examiner's rejection of claims 1–3, 9, 16, 17 and 19–21 in his application[1] for a fungicidal agent. Claims 1 and 2 are illustrative of the compounds sought to be patented.

"1. A salicylate of a carboxylic organic acid ester of an 8-hydroxyquinoline.

"2. A compound of the formula

wherein R is the acyl group of an organic carboxylic acid, and X is a member of the group consisting of hydrogen, lower alkyl, and chlorine."

Claim 16 is illustrative of the composition claims.

"A pharmaceutical preparation for the treatment of fungal infections comprising a pharmaceutical carrier mixed with a compound as defined in claim 1."

Appellant states that his compounds may be used for "athletes foot" or as industrial mildewproofing agents. It is admitted that the use of 8-hydroxyquinoline, also known as oxine,

as an antifungicide is well known, but it produces irritation when used on the skin. Appellant describes his inventive concept as follows:

Appellant, however, conceived the idea that by blocking the hydroxyl and amine (pyridine) groups of the oxine, the irritant action could be reduced or eliminated while still retaining the antifungal activity; that is, by forming an ester with the OH group (by reaction with an organic carboxylic acid) and by neutralizing the basic amine moiety (by adding on an acid to form a "salt"). However, when appellant attempted to prepare salts of esters, he found that with the many salifying acids that he tried, no reaction would take place. Thus, as described in the specification * * the benzoic acid ester of 8-hydroxyquinoline could not be made to form a salt with malonic, maleic, citric, tartaric, phthalic, B-resorcylic and gentisic acids under a variety of conditions, despite the fact that 8-hydroxyquinoline itself readily forms salts with these acids, the salts being well-defined and isolatable.

---

[1]. Serial No. 758,555, filed September 2, 1958, for "Fungicidal Agent and Process for Manufacturing Same."

Appellant found, however, that salicylic acid was an outstanding exception and formed salts not only with the preferred benzoic acid ester of 8-hydroxyquinoline but also with its other esters. Even phthalic acid, which is closely related to salicylic acid, failed to form a salt with 8-benzoyloxyquinoline.

As stated in appellant's specification and noted by the board, 8-benzoyloxyquinoline salicylate, one of appellant's preferred species, has an order of activity at least three-fold that of the parent compound, 8-hydroxyquinoline.

The examiner allowed claims to 8-benzoyloxymethylquinoline salicylates and di-8-quinolinylphthalate di-salicylate but rejected generic claims and species claims to 8-benzoyloxyquinoline salicylate and 8-benzoyloxychloroquinoline salicylates. The several grounds of rejection applied against the claims will be discussed separately.

### Inadequate Disclosure

At the threshold of our consideration of the issues here presented, it appears necessary to make disposition of certain contentions set forth in the solicitor's brief and asserted in argument before us.

■ It is contended that the appeal of claims 1 and 2 must be dismissed because appellant's reasons of appeal do not allege error in the rejection of these claims as lacking support in the specification and the rejection must therefore stand. It is further contended that if the appeal is not dismissed as to claims 1–2 and claims 13–14 as lacking adequate support in the specification, the rejection of these claims should be affirmed because "although reason of appeal No. 8 alleges error in such rejection of claims 13 and 14, the brief on behalf of appellant does not controvert or discuss the rejection."

In support of these contentions, the solicitor cites In re Gruschwitz et al., 320 F.2d 401, 50 CCPA 1498 and In re LeBaron, 223 F.2d 471, 42 CCPA 956.

The record discloses that the examiner rejected claims 1–2 for failure to properly define the invention; claims 1–2 as unpatentable over the art of record, and claims 1–2 and 13–14 as lacking adequate support in the specification. The board sustained the examiner as to claims 1 and 2 but reversed as to claims 13 and 14.

For reasons hereinafter to appear, it is not necessary to discuss further claims 13 and 14 in connection with the above noted contentions.

We turn to the asserted inadequacy of the reasons of appeal as they relate to claims 1 and 2. Analyzing the reasons of appeal cumulatively, we find assignments of error amply embracing rejection as unpatentable over a combination of references; claiming subject matter that would be obvious from the references; as being unduly broad and failing to point out the invention; in sustaining rejection of certain claims for reasons applied to others and rejection as unpatentable over a specific reference.

■ In our judgment the reasons of appeal are sufficiently broad in scope and adequate to bring within our purview and comprehension every facet of the matter before us essential to the attainment of the ends of justice. The reasons of appeal are sufficiently replete with properly cognizable substance to enable us to determine, if necessary, whether or not the board committed error in rejecting claims 1 and 2 as lacking adequate support in the specification. Inadequate support of the specification may be another way of saying the claims are unduly broad. Both rejections have their basis in 35 U.S.C. § 112. The specification and the claims constitute the heart of the record. They are before us. Courts do not decide in a vacuum nor are they called upon to close their eyes to the obvious.

There is no possible basis for comparison of the scope and substance of the reasons of appeal here with the total lack of those attributes in the reasons of appeal with which the majority of

this court dealt in In re Gruschwitz, where neither specifically nor cumulatively were any reasons assigned by appellant. In the so-called reasons of appeal the claims were merely numerically identified in association with the allegation that the board had committed error in its rejection. As in In re Timmerbeil, 320 F.2d 413, 50 CCPA 1514, no reason whatsoever was assigned except a statement, totally devoid of a modicum of specificity, that the board had committed error.

■ Notice of appeal was given on May 1, 1963. On the same date appellant filed further request for reconsideration relating to claims 13 and 14 calling the board's attention to the examiner's rejection of these claims and the board's blanket affirmation of the decision of the examiner with no mention of claims 13 and 14 in the discussion of the rejection in the board's opinion.

By letter dated May 29, 1963 the board took cognizance of the allegations and prayer of the petition for reconsideration and corrected its decision by certifying its reversal as to claims 13 and 14. The language concluding the decision was changed from "AFFIRMED" to "AFFIRMED-IN-PART." This action was taken by the administrative officer by order of the board. The board recognized and stated that it was bereft of jurisdiction to further consider the appealed matter by reason of the previous filing of the notice of appeal with its consequent transference of jurisdiction to this court, citing In re Allen, 115 F.2d 936, 28 CCPA 792. The board stated that "it may, for purposes of appeal to the Court, correct any typographical errors, obvious omissions, etc." The solicitor contends that this action by the board taken after the notice of appeal was ultra vires on its part and that it could not have the effect of reversing the rejection because the decisions of the board theretofore rendered did not mention this rejection but affirmed the examiner generally which is to be construed as an affirmance of the rejection.

We have no quarrel with the principle enunciated in In re Dreshfield, 110 F.2d 235, 27 CCPA 1013; In re LeBaron, supra, and In re Rogoff, 261 F.2d 601, 46 CCPA 733, cited by the solicitor. These cases are completely inapposite to the situation here presented.

The board did nothing more than to exercise a purely ministerial function in its administrative capacity. It simply corrected *nunc pro tunc* an error of omission plainly obvious to it. It made no new or different determination of an issue. It exercised no judicial function. It merely certified the fact of an unrecorded determination made when the matter was within the full competence of its jurisdiction. It was well within its province in so doing. Claims 13 and 14 were allowed and are therefore not embraced by the appeal before us.

In allowing claims 13 and 14 the board necessarily reversed the examiner's rejection that the disclosure was inadequate. It seems clear that the ground of rejection as applied to claims 1 and 2 was also reversed since there is no basis for distinguishing between the two sets of claims. However, since the record is not clear on this point, we will consider the rejection as applied to claims 1 and 2.

The examiner's answer states the rejection as follows:

"The basis for this rejection is that the specification only prepares the unsubstituted or lower alkyl substituted organic carboxylic acid ester quinoline salicylates. Nowhere in the specification is there any indication of the preparation of the chloro derivative. While it is recognized that the original claims constitute part of the specification and claims 13–14 were directed to specific chloro derivatives of the claimed compounds, there is no basis for these claims in the specification."

■ In objecting to the lack of a working example describing the formation of a chloro-substituted compound, the examiner is apparently relying upon

the "how to make" requirement of 35 U.S.C. § 112. The issue would then appear to be whether one skilled in the art would be able to make the disclosed chloro-substituted compounds. Appellant has not argued this point in his brief. He apparently thought that the rejection had been dropped because of the board's allowance of claims 13 and 14. The solicitor maintains that since the appellant has not controverted the rejection, it *must* be affirmed and cites In re Le-Baron. We do not consider LeBaron apposite. LeBaron held only that with regard to a prior art rejection, failure to argue that a particular feature recited in a claim made it patentable is an abandonment of any claim to patentability based on the recited feature. We do not feel that a claim is abandoned for failure to argue one ground of rejection. Such a result would be particularly inequitable in the present case where appellant relied upon the letter from the Patent Office which might reasonably have led him to believe that the rejection had been dropped.

■ Despite the lack of argument in appellant's brief, we think that the rejection lacks merit. Appellant's example VI indicates that 8-benzoyloxy-4-methylquinoline salicylate is prepared by first esterifying 4-methyl-8-hydroxyquinoline and then salifying with salicylic acid. The Neher patent indicates that 5-chloro-8-hydroxyquinoline may be esterified by undecylenic acid chloride. Since chloro-8-hydroxyquinoline is a known product and easily esterified as indicated by Neher, one skilled in the art would apparently have no trouble making appellant's chloro-substituted compounds according to the general process set forth in appellant's working examples. Thus, the rejection of claims 1 and 2 for an inadequate disclosure with regard to the chloro compounds is reversed.

*Prior Art Rejection*

■ The generic claims and the benzoic acid ester species were rejected as obvious in view of the prior art. The primary reference, an article by Matsumura,[2] describes the formation of benzoyloxyquinoline hydrochloride,

In that portion of the Matsumura article incorporated in the record, there is no indication of utility for 8-benzoyloxyquinoline or its hydrochloride.

An article by Van Winkle and Christiansen[3] was relied upon by the examiner to show 8-hydroxyquinoline salicylate,

Salicylic acid

2. 52 J.Am.Chem.Soc. 463.

3. 18 J.Am.Pharm.Ass'n, 794–796.

The article describes work performed in order to determine if the acid molecule attached to the 8-hydroxyquinoline nucleus affected skin irritation accompanying the use of the compounds as antiseptics. Five compounds, the sulphate, citrate, tartrate, β-resorcylate and salicylate were tested. Results indicated that changing the acid molecule had little effect on antiseptic action and irritation. Germicidal activity was affected with the sulphate and citrate being the most effective germicide.

The third reference, a patent to Neher,[4] discloses undecylenic acid esters of 8-hydroxyquinolines, Neher states that

salts of a large number of acids, both mineral and organic (including acetic and propionic acids) can be formed "in the usual manner."

The board summarized the examiner's position as follows:

"It is the Examiner's position that the compounds of the prior art are known to possess antifungal activity; that the specific ester of 8-hydroxyquinoline defined in claim 9 [8-benzoyloxyquinoline] is shown in Matsumura and the substitution of salicylic acid as the salifying agent in place of the hydrochloride would be sufficiently evident to one of ordinary skill in this art in view of Van Winkle et al. The Examiner further refers to Neher as showing the broad concept of organic acid esters of 8-hydroxyquinoline and corresponding halogen and methyl substituted derivatives thereof salified by other organic acids as having antifungal activity. Accordingly,

the Examiner holds the substitution of salicylic acid specifically as the salifying agent for the hydrochloric acid in Matsumura would be obvious in view of the cited art."

Appellant argues that salification of the 8-benzoyloxyquinoline of Matsumura with salicylic acid is not obvious and points to the fact that of the many organic acids tested only salicylic acid worked. He further relies on his affidavit, filed after the board's decision, which indicates that acetic and propionic acids do *not* form salts with the Neher compounds. It was appellant's contention that Neher's teaching was erroneous and that failure of acetic and propionic acids to salify an oxine ester would lead away from using another organic acid such as salicylic acid. In its consideration of the affidavit, the board did not criticize it but only stated:

"Appellant's unsuccessful attempts to prepare the salts disclosed in Neher are not considered as affecting the clear teaching of such salts, without regard to the method by which they were made."

The solicitor argues that if acetic and propionic acids will not salify the oxine ester,

"* * * only a chemist without the slightest initiative would stop without trying other carboxylic acids, and salicylic acid would be one of the first to be tried by the person skilled in the art because salicylic acid is known to be useful in this respect as taught by Van Winkle et al."

This statement seems to overlook the difference between oxine and the oxine ester. The failure of acetic and propionic acids to salify the oxine ester would indicate that salification of the ester is more difficult than salification of the oxine and might well suggest stopping. If one exhibited "initiative" and looked to the Van Winkle article, the most obvious acids are the citrate

4. U.S. Patent 2,666,058, January 12, 1954.

and β-resorcylate. Yet these acids, according to the uncontroverted statement in appellant's application, will not salify the oxine ester. To go further would indeed require initiative.

Another factor to be considered is the improved properties of appellant's compounds as compared to the parent compound oxine. Oxine causes skin irritation, whereas appellant's compounds are relatively free of irritation. Furthermore, as noted by the board, appellant's 8-benzoyloxyquinoline salicylate has an antifungal activity which "is at least three-fold that of the parent compound, 8-hydroxyquinoline." The appellant cites In re Papesch, 315 F.2d 381, 50 CCPA 1084, in urging that the properties of his compounds must be considered in the determination of obviousness. The solicitor contends that a difference of degree between the properties sought to be patented and the prior art does not establish unobviousness. We think that a large difference in degree, such as is present here, is persuasive evidence to be considered along with other evidence of unobviousness.

After carefully weighing the evidence before us, we hold that the claimed compounds are not obvious in view of the prior art. It is possible, to be sure, to reconstruct appellant's compound, carefully fitting together the three references. However, in view of the difficulties encountered in salifying an oxine ester and the improved properties obtained when the proper salifying agent, salicylic acid, is chosen, such a reconstruction cannot be considered an obvious one. The prior art rejection is thus reversed.

### Undue Breadth

■ Claims 1, 2, 3, 16, 19 and 21 were rejected for failing to properly define the invention in the claims under 35 U.S.C. § 112 because of the term "carboxylic organic acid." The objection was stated in the examiner's answer as follows:

"The use of such broad terminology not supported by the specification renders the claims 'a mere invitation to experiment' and fails to meet the requirements of 35 U.S.C. 112. The esters of pinonic acid, caronic acid, and thujaketonic acid, caryophyllenic acid, vitamin $A_2$ acid, etc. are embraced by the terminology 'carboxylic organic acid ester.' Clearly such complex structures are not supported by the description of the invention in the specification or any of the working examples."

The examiner also felt that the term embraced carboxylic acids containing inoperative "substituents such as $CH_2=CH-C\equiv C-CH=CH-C\equiv CH-$[sic]."

The appellant argues that his application indicates that the essential feature of the ester is that it must be an organic carboxylic acid, and that it does not make any difference what the acid is. He further states:

"Applicant has not, of course, tested all carboxylic acid esters of oxine; but he has tested a sufficient number to reach the reasonable conclusion that the nature of the esterifying acid is of no consequence * * *."

■ The problem confronting us here is not a novel one. We are well aware of the arguments on both sides. The Patent Office requires strict conformity with the statute in order to protect the public. The applicant, on the other hand, should not be denied the use of language necessary to give him the broadest protection commensurate with the scope of his disclosed invention. In deciding the question of undue breadth, it is necessary then to consider the scope of the disclosed invention.

In his specification appellant teaches that the acid may be monobasic, dibasic, aromatic or heterocyclic. These acids may contain the following groups, "alkyl, * * * aryl, aralkyl, aralkylene, furyl, and the like." Appellant has indicated that the carboxyl group is the essential part of the organic acid. He has suggested a theory which supports this contention. Furthermore, he has defined carboxylic acids broadly and named a

wide range of specific acid esters, e. g., acetate, palmitate, cyclopentylacetate, benzoate, veratrate, phthalate and succinate. It is further noted that the remainder of the fungicide is limited to 8-hydroxyquinoline and salicylic acid, which according to appellant are important in determining the properties of the compound.

In view of the breadth of the disclosure of the ester portion and appellant's contention that there is nothing critical in the carboxylic acid used, we hold that the term "carboxylic acid" is not unduly broad. In holding thus, we do not underestimate the seriousness of the examiner's objections. However, in this case we do not feel that the dangers are so great that the scope of appellant's claims should be restricted. The solicitor relies upon In re Sus, 306 F.2d 494, 49 CCPA 1301, in asserting that appellant's invention is too broadly claimed. In Sus, this court found "substituted aryl" to be too broad because only a limited number of aryl compounds were disclosed and because the use of the compounds specifically disclosed was essential to securing the asserted novel results. We do not have that situation here. Appellant has defined his carboxylic acids broadly and has indicated that according to his theory almost any carboxylic acid will work.

The decision of the board is thus reversed.

Reversed.

RICH, Judge, with whom SMITH, Judge, joins (concurring).

This case is one more example of why reasons of appeal should be dispensed with by statutory amendment. They continue to waste our time and energy in useless debate over senseless technicalities.

See my concurring and dissenting opinions in In re LePage's Inc., 312 F.2d 455, 50 CCPA 852, and In re Gruschwitz, 320 F.2d 401, 50 CCPA 1498, respectively, and Judge Smith's dissenting opinion in In re Timmerbeil, 320 F.2d 413, 50 CCPA 1514.

Reasons of appeal waste our time because the Patent Office appears to consider it to be its legal duty to waste its time concocting arguments as to why reasons of appeal *may* not be legally sufficient under *some* of our many conflicting opinions on the question.

Meanwhile the backlog in this court increases as it does in the Patent Office, is threatening to increase further, and such time wasting is inimical to sound government.

*The Claim 13–14 Jurisdictional Question*

The court's opinion appears to take the view that the "purely ministerial" and *nunc pro tunc* correction by the board of its opinion, to express its intention to allow claims 13 and 14, presents a fact situation distinguishable from that in In re Allen, 115 F.2d 936, 28 CCPA 792.

In Allen, the day following the filing of the notice of appeal the board rendered a decision saying:

"This is a petition for reconsideration of our decision dated September 30, 1939.

"Reconsideration of claim 3 is requested. *Through inadvertence* this claim was not listed as allowable in our former decision. It contains the same limitation as the claims which we held allowable." [Emphasis added.]

The board allowed claim 3 but this court held the board was without jurisdiction to do so because of the taking of the appeal. It thereupon considered claim 3 as rejected, reviewed the rejection on the merits, and allowed it for the very reason the board had tried to allow it, a great work of supererogation.

Since I think the decision in the instant case is sound and is clearly inconsistent with Allen, I would expressly overrule Allen to the extent hereinafter indicated and not leave it to be inferred that we have to some uncertain extent modified it.

There is a good reason to overrule Allen as to ex parte cases. The reasoning of that opinion is faulty in treating all appeals to this court from the Patent Office as though they were appeals from a trial *court* to an appellate court. The analogy holds only in *inter parties* cases wherein a Patent Office tribunal, the Board of Patent Interferences or the Trademark Trial and Appeal Board in an opposition or interference, renders a decision determining rights as between two or more parties litigant, none of whom is the Patent Office. In doing that the tribunal does act as a court (though it is not one) and the procedure followed in other courts is analogous and may well be followed.

In *ex parte* cases the situation is entirely different and the Patent Office tribunal, the Board of Appeals or the Trademark Trial and Appeal Board acting in an ex parte case, is but an arm of the administrative agency which *is itself a party litigant* when the case reaches this court. The applicant-appellant in our court in an ex parte case is here demanding his rights under the law, not against some private party, but from the administrative agency. That agency appears in our court, through its Solicitor, in the posture of an opposing party litigant but, realistically, still as the agency refusing the demands of the appellant. The Patent Office posture is that of a *defendant*, not that of a court. The only reason for hearing the case at all is to decide whether the agency is legally justified in its refusal. If, for any reason whatever, the agency wishes to alter its refusal in any degree and to concede to the appellant any of his demands, I know of no reason, either in the authority or the "reason" found supposedly controlling in Allen, why the agency cannot go far beyond the correction of inadvertently erroneous refusals and concede any part or all of the rights demanded by the appellant while the case is in our court. There is no reason why we should hear and determine appellants' claims to patent or trademark registration rights which the Patent Office is willing to concede to him. Our function under the law is merely to review refusals adhered to.

In civil litigation, when a plaintiff makes demands of a defendant, the first court to hear them does not insist on hearing and deciding cases in which the defendants are willing to confess judgment. Why should we? In ex parte cases we are the *first* court to hear the claim.

As a result of the Allen case, the anomalous situation now exists that the Patent Office takes a rigid position that it loses jurisdiction to do anything in an ex parte case as soon as the notice of appeal to our court is filed; but if review of its refusal in the same case be sought under 35 U.S.C. § 145 or 15 U.S.C. § 1071(b) (Sec. 21(b) of the Lanham Act as amended) by civil action against the Commissioner of Patents in the District Court, the Patent Office deems itself able to behave like any other party defendant to a suit and as capable of conceding the plaintiff's claims at any time. Appeals to this court therefore prevent, under the wholly unnecessary and ill-founded technicality of the Allen rule, the desirable settlement of litigation. The error and evil of the rule should be transparently obvious.