**Application of Rudolf WIECHERT.**
**Patent Appeal No. 7636.**

United States Court of Customs
and Patent Appeals.
Jan. 19, 1967.

Michael S. Striker, New York City, for appellant.

Joseph Schimmel, Washington, D. C., (Jack E. Armore, Washington, D. C., of counsel) for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 1–3 of application serial No. 98,026, filed March 24, 1961, for "1α-Methyl Steroids." Claims 11–18 and 25 have been allowed.

### Introduction

The invention relates to certain 1α-methyl dihydrotestosterones and their 17-acylates which possess strong androgenic and anabolic activities. Claim 1,

generic to all claims in the application, reads:

1. A compound of the formula:

wherein X is selected from the group consisting of hydrgen and halogen; wherein

and wherein R is selected from the group consisting of

wherein acyl is derived from a lower aliphatic carboxylic acid.

Appealed claims 2 and 3 are directed to that embodiment of the invention wherein the substituent X in the structural formula of claim 1 is a hydrogen atom. All of the allowed claims are directed to compounds, or processes for making them, wherein X is a halogen.

The appealed claims were rejected by the examiner under 35 U.S.C. § 103 as obvious "from the standpoint of structural chemistry" in view of a sole reference:

Ringold et al. [I] 2,908,693 Oct. 13, 1959

In addition, the examiner cited the following patent "to show the state of the art":

Ringold et al. [II] 3,032,552 May 1, 1962 (Filed Apr. 5, 1955)

The examiner contended that Ringold [I] discloses dihydrotestosterones which are the 1-desalkyl derivatives of the compounds claimed by the appellant. Ringold [I] is concerned with a process for the production of 2-methyl-dihydrotestosterones and it shows compounds of the following structural formula as starting materials:

where R represents hydrogen or a lower alkyl group of less than 7 carbon atoms. The examiner stated that "the claimed compounds are so closely related to the prior art compounds * * * as to be obvious * * *."

Appellant submitted an affidavit by Langecker [1] which shows, in the words of the examiner, that "1-methyl dihydrotestosterone is 7.5 times as strong anabolically and 7 times as strong androgenically as the prior art compound." Appellant contended in essence that the superior properties of his novel compounds impart patentability thereto under In re Papesch, 315 F.2d 381, 50 CCPA 1084.

The examiner considered the differences in properties shown by appellant's affidavit to be merely "differences of degree rather than of kind" and gave "no affirmative weight" to the affidavit. In addition, the examiner cited Ringold [II] as showing that the prior art was aware that the 1-methyl substituent would enhance the properties of the "parent compound." Ringold [II] relates to certain 1-methyl-19-nor-$\Delta$ 4-3-ketones, which include 1-methyl-19-nor-$\Delta$ 4-androstene-17$\beta$-ol-3-one (1-methyltestosterone), and the method of their preparation. The particular portion

1. Dr. Hedwig Langecker was, from 1934 to 1945, an associate professor of Experimental Pharmacology and Pharmacognosy at the German University of Prague and, at the time of the affidavit, a scientific advisor for the firm of Schering A.G., Berlin, Germany, assignee of the application at bar.

of Ringold [II],[2] designated by the examiner for the above purpose, states:

> The novel compounds of the present invention are novel androgenic hormones having at least the anabolic activity characterizing testosterone and in some instances having *enhanced or lesser* androgenic effects. (Emphasis ours.)

The board, in affirming the examiner's rejection of claims 1–3, considered the claimed compounds are so closely related to the prior art compounds as to be obvious to those skilled in the art and found that the affidavit did not overcome "the presumption of obviousness." However, the board then added:

> We further note that the compound set forth in column 1, lines 60 to 70 of the Ringold et al. reference [Ringold I] is a position isomer of both the instant 17–ol and 17-ester compounds *and there is nothing persuasive of record to indicate* that the instant compounds are patentable thereover. [Emphasis ours.]

The "position isomer" of Ringold [I], not specifically relied on by the examiner and noted for the first time by the board, has the following structural formula:

where R represents hydrogen or a lower alkyl group of less than 7 carbon atoms and R'' represents hydrogen or an acyl group of a hydrocarbon carboxylic acid of 2 to 12 carbon atoms. A comparison of the above formula with that of claim 1 will show that the two differ mainly in the location of the $CH_3$ group on the left ring of the 4-ring nucleus. Thus, the board termed the two "position isomers."

After the board's decision was rendered, the history of this application became considerably more complicated. The details of that portion of the prosecution are fully set forth in Part II of this opinion, infra. Suffice it to say for the present that counsel for appellant described it, during oral argument, as a "nightmarish" situation.

We have divided this opinion into two sections, in part for the reason that the argument on the merits and a reargument on the question of the composition of the Board of Appeals panel hearing the case were heard by different benches. We come now to "Part I," dealing with the "merits," that is to say the rejection of the claims.

### I. Merits of the Rejections Based on Ringold [I]

As indicated above, the examiner rejected the appealed claims on the basis of the so-called 1-desalkyl derivatives of

---

2. Ringold [II] is not included in the printed record but copies of that patent were later furnished to us by the Patent Office.

the claimed 1-methyl dihydrotestosterones shown in Ringold [I]. While the Board affirmed the examiner's reasoning, it made the additional observation that Ringold [I] discloses a position isomer of the claimed compounds and such isomer is also a bar to the patentability of appellant's claims. We will take up these issues in that order.

Appellant attempted to overcome the examiner's rejection by the submission of the Langecker affidavit. The examiner's Answer before the board admitted that the affidavit shows the claimed compounds to be about 7 to 7.5 times as effective as the prior art compound. However, the examiner, and the board, found the affidavit insufficient to overcome the reference since affian. has shown no *new* properties but merely an alleged improvement in the *same* properties. The improvement in the same properties possessed by the prior art compounds is labeled by the examiner and the board as "differences of degree rather than of kind."

Appellant contends that obviousness of a novel compound is to be decided not only from a comparison of its structural formula with that of the prior art compound, but from all properties of the compounds. In re Papesch, supra. Appellant then submits that the 7-fold androgenic activity and 7.5-fold anabolic activity shown for his compounds constitute "clear proof of unobvious and patentable greater effectiveness."

We think appellant's contentions have merit and the board's decision with respect to the rejection based on the 1-desalkyl compounds of Ringold [I] is therefore reversed.

■ As we indicated in In re Lohr, 317 F.2d 388, 50 CCPA 1274, it is possible to obtain a patent where the showing proves substantially greater effectiveness:

When a new compound so closely related to a prior art compound as to be structurally obvious is sought to be patented based on the alleged greater effectiveness of the new compound *for the same purpose as the old compound,* clear and convincing evidence of substantially greater effectiveness is needed. [Emphasis added.]

Again, in In re Grier, 342 F.2d 120, 52 CCPA 1081, we held that a large difference in degree (3-fold increase) was persuasive evidence, in the absence of countervailing evidence, of unobviousness. See In re Carabateas, 345 F.2d 1013, 52 CCPA 1386, where a showing of six and nine times effectiveness was held insufficient to establish patentability because the record there contained "*other* evidence" (our emphasis) which compelled a holding of obviousness.

■ In the case at bar, we are impressed by the 7-fold improvement in activity and, in the absence of valid countervailing evidence, we find the claimed compounds to be unobvious. There is nothing in any reference of record which would suggest any improvement, let alone a 7-fold improvement in activity.

The examiner apparently attempted to rebut the thrust of the affidavit by citing Ringold [II] as showing the art was aware that the 1-methyl substituent would enhance the properties of the parent compound. The statement in Ringold [II] relied upon by the examiner, quoted above, clearly does not support that proposition. In the first place, Ringold [II] only states that his compounds have "at least the anabolic activity" of the prior art testosterone and "in some instances * * * [have] enhanced or lesser androgenic effects." These phrases could hardly be characterized as teaching that these activities would be increased at all, let alone increased several fold. Furthermore, the cited statement in Ringold [II] refers to 1-methyl-19-nor-testosterone and there is no showing that such 19-nor compound and the claimed compounds behave in a similar fashion when substituents are added to or deleted therefrom. Therefore, Ringold [II] does not support the allegation of the examiner.

The solicitor's brief alleges certain inconsistencies between the two tables in the affidavit and between the affidavit and the application as originally filed. However, these alleged inconsistencies were not pointed out or adverted to by either the examiner or the board. Hence we regard this attack, on the credibility as opposed to the sufficiency of the affidavit, to be a new issue rather than a new argument and therefore not properly before us. In re Nygard, 341 F.2d 924, 52 CCPA 1032.

We turn now to the issue raised by the "position isomer" first noted in the board's opinion. The board's language, quoted above, in noting the isomer, appears to us to be a rejection of the appealed claims on the ground the claimed compounds are obvious, under 35 U.S.C. § 103, in view of the disclosed isomer. For reasons to be stated below, we find this to be a ground of rejection which was specifically pointed out for the first time by the board and, under the facts of this case, we believe that appellant should be afforded an opportunity to respond to that rejection. In view of the board's failure to do so, we remand the case to the board for further proceedings. Cf. In re Yale, 347 F.2d 995, 52 CCPA 1668.

Position isomerism involves close structural similarity which is to be taken into consideration with all other relevant facts in applying the test of obviousness under section 103. In re Mehta, 347 F.2d 859, 52 CCPA 1615. However, all other relevant facts must also be considered, as the board appears to have been aware when it stated that "there is nothing persuasive of record to indicate that the instant compounds are patentable" over the isomer. Of course, there is nothing of record to so indicate since the isomer was first pointed out and relied upon by the board.

As we had occasion to state, in a different factual situation in In re Hughes, 345 F.2d 184, 52 CCPA 1355:

> It seems basic to the concept of procedural due process that an applicant at least be informed of the broad statutory basis for rejecting his claims, so that he may determine what the issues are on which he can or should produce evidence.

In the present case, the rejection first advanced by the board left appellant without an opportunity to make a showing of unobviousness. Appellant requests that we provide such an opportunity by remanding the case to the board.

An applicant's attention and response are naturally focused on that portion of the reference which is specifically pointed out by the examiner. More important, where, as here, the appellant depends on a showing of unexpected properties to support patentability, the comparison which results in a conclusion of unexpected properties cannot practically be made for all of the compounds which might be mentioned in a particular reference.[3] Under such circumstances, we conclude that when a rejection is factually based on an entirely different portion of an existing reference the appellant should be afforded an opportunity to make a showing of unobviousness vis-à-vis such portion of the reference.

## II. The Question of the Composition of the Patent Office Board of Appeals

This case was initially argued here on 10 March 1966, Judge Kirkpatrick sitting by designation in place of the Chief Judge pursuant to 28 U.S.C. § 294(d). At that time the case was argued on the merits. Appellant also called to our attention a request for reconsideration,[4] contained in the record before us,

---

3. This point seems to be appreciated by the Patent Office itself as its Rule 106(b) provides, inter alia, that:

 When a reference is complex or shows or describes inventions other than that claimed by the applicant, the particular part relied on must be designated as nearly as practicable.

4. Appellant's original brief here says "appellant filed a request for reconsidera-

in which, following the wholly adverse and unanimous decision of the board of 30 October 1964, appellant pointed out that the board rendering the decision consisted of Federico, Examiner-in-Chief, and Stone and Rosdol, *acting* Examiners-in-Chief. Appellant pointed out that Stone was a Supervisory Examiner. Rosdol, presumably, was a Primary Examiner. While expressly disavowing any objection to the abilities of the acting Examiners-in-Chief, it was urged by appellant that the board was improperly constituted under 35 U.S.C. § 7[5] in that *not more than one acting* Examiner-in-Chief could be a member of a three-man board hearing an appeal— that there must be two regularly appointed (as distinguished from temporarily designated) Examiners-in-Chief. The Request for Reconsideration asserted that the adverse decision of the board was a "nullity" because the board was improperly constituted. Appellant requested that the case "be set for rehearing before a properly constituted Board of Appeals."

The Request for Reconsideration points to no error in and asks for no revision of the board decision.

The record shows no further action by any Board of Appeals in this case prior to the taking of this appeal. What transpired, in summary, is the following:

1. The 3 Dec. 1964 response by the Patent Office to the above Request for Reconsideration is entitled "Commissioner's Decision" and was by the First Assistant Commissioner. It opens with the statement, "This is a petition requesting that the decision of the Board of Appeals rendered October 30, 1964 in this case affirming the decision of the primary examiner be vacated and that the case be set for hearing before another board." The decision was:

> It is clear from the quoted language [from 35 USC 7, see note 2, supra] that the expression "such primary examiner" refers to the "patent examiner of primary examiner grade" previously referred to and not to the examiner of higher grade. Since a supervisory examiner is of a higher grade than a primary examiner, the board which decided this case was properly constituted and the petition is accordingly denied.

2. On 14 Dec. 1964 appellant filed a "Petition to Commissioner" under Rule 181 asking the Commissioner, acting under his rule-suspending power (Rule 183), (a) to permit the filing of the petition for reconsideration, (b) to waive the

---

tion * * *." The printed record contains this paper with the printed heading, prepared in the Patent Office, "Request for Reconsideration, November 20, 1964." Our Rule 25(3) (b) calls for simplifying such headings to a short title and date an inquiry by us of the Patent Office has brought on the fact that the actual title on the paper as filed was, "Petition to the Commissioner of Patents for a New Hearing before the Board of Appeals."

As required by Patent Office Rule 1, the paper was addressed: "Hon. Commissioner of Patents, Washington, D. C." It bears a Mail Room stamp of Nov. 20, 1964, and a Board of Appeals stamp of Nov. 23, 1964.

On its face it appears to be directed to the Board of Appeals since it requests that the decision of the board be "withdrawn" and it would appear that no one other than the board itself could "withdraw" its opinion. See also 35 U.S.C. § 7, last sentence of first paragraph, reading: "The Board of Appeals has sole power to grant rehearings."

5. Paragraph 2 of 35 U.S.C. § 7, so far as applicable here, reads:

Whenever the Commissioner considers it necessary to maintain the work of the Board of Appeals current, he may *designate* any patent examiner *of the primary examiner grade or higher*, having the requisite ability, to serve as examiner-in-chief for periods not exceeding six months each. An examiner so designated shall be qualified to act as a member of the Board of Appeals. *Not more than one such primary examiner* shall be a member of the Board of Appeals hearing an appeal. [Emphasis ours.]

third sentence of Rule 304 to permit filing this appeal 30 days after the decision on said petition, (c) to extend the time for filing a new petition and the filing of an affidavit appellant wished to file answering an alleged new ground of rejection by the board, and (d) to extend the time for filing appeal from the board's decision.

3. A Commissioner's Decision of 22 Dec. 1964 denied all requests for want of a showing of "an extraordinary situation" as required by Rule 183, in the absence of a showing why the board was not requested *to reconsider* its decision within the time provided by Rule 304.

4. On 24 Dec. 1964 another "Petition to Commissioner" argued that an extraordinary situation had been shown and that appellant could not have asked the *same* board to *review* its decision without admitting the board was properly constituted.

5. The Commissioner's Decision of 24 Dec. 1964 denied the petition filed the same day.

6. This appeal was taken 29 Dec. 1964, by Notice of Appeal, the eight reasons of appeal annexed thereto alleging error only with respect to the rejection of claims and making no reference, direct or otherwise, to the previously asserted unlawful constitution of the board.

All of the papers above referred to are included in the record before us. Appellant's brief contains a recitation of what transpired in the Patent Office to lay the basis for only one request of us, namely, that if we do not find the appealed claims allowable, we *remand* the case to the board "so as to afford appellant an opportunity to submit in an affidavit the tests described hereinabove and to have this affidavit evaluated by the Patent Office prior to adjudication of this case by the Hon. Court of Customs and Patent Appeals." This is the affidavit referred to in "2", above. We are

not asked to do anything about, or to take any other action based on, the alleged unlawful constitution of the board.

Having been made aware of the foregoing factual situation, this court set this case down for reargument by an order dated 10 June 1966, In re Wiechert, 361 F.2d 482, 53 CCPA 1351, the reargument to be limited to the following three questions:

1. Is this court authorized to consider, in the present proceeding, appellant's challenge to the composition of the Board of Appeals whose decision is here appealed?

2. What authority, if any, permits the Commissioner of Patents to designate as members of a Board of Appeals under paragraph 1 of 35 U.S.C. § 7, more than one examiner-in-chief serving in such capacity by designation of the Commissioner pursuant to paragraph 2 of 35 U.S.C. § 7?

3. Was the Board of Appeals which rendered the decision here appealed validly constituted under 35 U.S.C. §§ 3, 7?

Briefs were filed by appellant and the Solicitor, U. S. Patent Office, and oral argument held 3 Oct. 1966 limited to the above questions. The five judges hearing the reargument were the regular members of this court. Judge Martin died thereafter, on November 5. By consent of the parties, the Chief Judge and Judge Kirkpatrick are participating in the decision of the entire case.

The Chief Judge, Judge Kirkpatrick and the writer are of the view that question 1, above, should be answered in the negative and that questions 2 and 3 should therefore not be considered, for the reasons more fully set forth below. We therefore reach the merits as dealt with in part I of this opinion.

■ Judge Almond's views are that question 1 should be answered in the affirmative,[6] that the answer to question

6. Judge Almond's stated view is that "this court would lack jurisdiction of the subject matter" if the appointment of one of the members of the board was defec-

tive. He does not mean, of course, that a decision of a Board of Appeals would not be subject matter of which we have jurisdiction. He means that there would be

2 is that 35 U.S.C. § 7 authorized the board as herein constituted and that the answer to question 3, therefore, is "Yes." He reaches the merits on that basis.

Judge Smith's view is that the answer to question 1 is "Yes," to question 2, "None," and to question 3 "No," wherefore he regards the board's decision as a nullity and would dismiss the appeal without consideration of the merits.

### The Answer to Question 1.

In the present proceeding, on the facts above recited, we should not and cannot consider the legality of the composition of the board for three principal reasons: (1) The question *was not raised* on this appeal by appellant; (2) having raised the question in the Patent Office, he *abandoned* it by not arguing it before us (except as we insisted on his doing so at the reargument); and (3) our *limited statutory authority* precludes our consideration of the question. These reasons will now be amplified.

 (1) As above pointed out, appellant failed to file any reason of appeal raising in this court the question of the board's constitution. That issue is therefore not before us. 35 U.S.C. § 142. We are limited by statute to the rendering of decisions "confined to the points set forth in the reasons of appeal", 35 U.S.C. § 144. Ample explanation of our long-established position on this point will be found in In re LePage's Inc., 312 F.2d 455, 50 CCPA 852, and In re Gruschwitz, 320 F.2d 401, 50 CCPA 1498. See also the cases listed in the writer's dissenting opinion in the latter case. We

agree with the solicitor's somewhat over-emphatic statement in his supplemental brief that:

> The stark unchallengable, naked fact shown by the record is that the appellant has uttered no challenge in this Court to the composition of the Board of Appeals that can properly be considered by this Court. There is no reason of appeal in the case at bar * * * which, directly, indirectly, or impliedly raises an issue as to the composition of the Board. * * * The legality of the Board is not an issue in this case. The challenge, if it be a challenge, is the Court's, not appellant's.

However broadly or narrowly this court may have construed reasons of appeal in the past, the total absence of a reason bearing, even remotely or by implication, on an issue alleged to be present in a case cannot be overlooked. *Le Page's,* supra.

By reason of facts brought out in the discussion of the next point, "(2)," we consider appellant's action in not asking us to review the Patent Office ruling on the board's composition to have been quite deliberate.

 (2) This court has uniformly followed the sound rule that an issue raised below which is *not argued* in this court, even if it has been properly brought here by a reason of appeal, is regarded as abandoned and will not be considered. It is our function as a court to decide disputed issues, not to create them. In re Baird, 348 F.2d 974, 52 CCPA 1747; In re Lorenz, 305 F.2d 875, 49

---

no decision of a Board of Appeals to which our jurisdiction could attach. Perhaps, in a broad sense, this is a "jurisdictional" question but it is well to bear in mind its precise nature. It is not a question of a lack of our power to decide but only an alleged lack of an object on which to exercise that power. It is somewhat confusing to regard it as a question of our jurisdiction.

It seems to us that an invalid appointment would not so vitiate a board's decision that neither waiver nor abandonment of the defect would be possible. In United States v. L. A. Tucker Truck

Lines, Inc., 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952), the Supreme Court held that the Interstate Commerce Commission was not ousted by jurisdiction in a case heard by an invalidly appointed examiner. Rejecting "technical compulsion[s]," the Court characterized the examiner's appointment as an "irregularity which would invalidate a resulting order if the Commission had overruled an appropriate objection" and "not one which deprives the Commission of power or jurisdiction * * *." We feel that the present case is governed by analogous considerations.

CCPA 1227 (footnote 2); In re LeBaron, 223 F.2d 471, 42 CCPA 956.

It is clear from the record, briefs, and oral arguments that appellant did not present the question of the legality of the board's composition to us as an issue for us to decide before we set the case for reargument. He merely told us about the contention he made below, in the past tense, and perhaps for the very good reason that he knew it was not within our jurisdiction to consider that issue.

The first indication that appellant dropped the issue of the board's composition in coming to this court is the absence of a reason of appeal,[7] as noted in "(1)" above. It is even clearer from a reading of his brief as a whole. After the recitation of the events described under "1" through "6" above, the brief concludes:

> Under the circumstances described above and apparent from the Transcript of Record, it is respectfully submitted that in the event that the application is not found allowable by the Hon. Court of Customs and Patent Appeals based on the record presently before the Court *this case should be remanded to the Hon. Board of Appeals* so as to afford appellant an opportunity to submit in an affidavit the tests described hereinabove [tests described in the brief but not of record] and to have this affidavit evaluated by the Patent Office prior to adjudication of this case by the Hon. Court of Customs and Patent Appeals.

Note that it is not even suggested that the case be remanded to a different board than the one which decided this case. In the "Conclusion" of the brief, appellant summarized on the remand request, *if* we deem it necessary to consider the proposed affidavit to find patentability in view of the alleged new ground of rejection made by the board, by saying,

* * * such remanding is proper in view of the extraordinary situation existing in this case, as more fully discussed above and apparent from the Transcript of Record.

The significance of this statement is that by reason of the challenge *below* to the board's constitution and the ensuing petitions and denials, appellant never succeeded in asking the board to *reconsider its decision.* He never pursued a procedure which would get into the record the affidavit of additional tests made after the board's decision and in response to the alleged new ground of rejection in the board's opinion. Now all he is asking us to do as a result of what he did, and what the Patent Office did, is to take this case history into account in considering his suggestion to remand *if* we do not find his claims allowable on the basis of other arguments. He is not asking us to pass on the constitution of the board. For all the brief shows, he regarded it at the time of the initial argument as a dead issue. In fact, it appears to us that he regarded it as dead as long ago as the filing of his final "Petition to Commissioner" on 24 Dec. 1964 in which he made this statement:

> It was only after the decision of the First Assistant Commissioner on December 3, 1964 denying the petition of November 20, 1964 that counsel for applicant had any basis for considering that the original Board of Appeals *had been properly constituted* and therefore in submitting a request that this same Board of Appeals reconsider its decision. [Emphasis ours.]

In any event, we can find nothing prior to our setting the case for rehearing indicating any desire on the part of appellant to have us pass on the legality of the constitution of the board, which we referred to in our prior per curiam order, in question 1, as "appellant's challenge."

---

7. It happens that appellant's counsel who signed the Notice of Appeal is personally very conscious of the reasons of appeal requirement as he was counsel for the appellant in In re Gruschwitz, supra, decided about a year and a half before the filing of the appeal herein, holding reasons of appeal inadequate and dismissing the appeal.

We wish to make it clear that it was not a challenge in this court and that whatever challenge was made was solely in the Patent Office and not pursued further.

 Had appellant wished to pursue the matter further his proper remedy, decisions of the Commissioner on petitions not being appealable to this court, as pointed out under (3) below, would have been by mandamus in the District Court. United States ex rel. Steinmetz v. Allen, 192 U.S. 543, 24 S.Ct. 416, 48 L.Ed. 555 (1904); Butterworth v. United States ex rel. Hoe, 112 U.S. 50, 55 S.Ct. 25, 28 L.Ed. 656 (1884); see Ex parte Frasch, 192 U.S. 566, 24 S.Ct. 424, 48 L.Ed. 564 (1904); 5 U.S.C. § 1009. That would be the proper forum in which to settle the question of the legality of the board's constitution, with appeal to the Court of Appeals available to either party from an adverse decision.

 (3) The basic limitation on our jurisdiction in 35 U.S.C. §§ 141, 143 and 28 U.S.C. § 1542 is to the review of "decisions" of the board. There was no decision by the board, whose decision was appealed here, that it was legally constituted. There was such a decision by the First Assistant Commissioner but there is no provision in the statutes for any appeal to this court from his decisions on petitions. They are reviewable by mandamus. Aggrieved applicants are therefore not without a remedy. But such Commissioner's decisions are not reviewable by us. To take up the legality of the board's constitution in this case would, therefore, appear to be doing by indirection what we have no authority to do directly and would amount to review of a Commissioner's decision that the board was legally constituted, which we have no jurisdiction to do. In re Jewett, 247 F.2d 953, 45 CCPA 714; see In re Mavrogenis, 57 F.2d 361, 19 CCPA 1063.

 The Patent Office has cited a number of our decisions to support the statement, which is true, that we will not ordinarily interfere in matters of Patent Office practice. We find them beside the point as the question here is not one of Patent Office practice. It is a matter of whose *decision* we are being asked to review, the board's or the Commissioner's. We have jurisdiction to review the former but not the latter.[8]

### Conclusion

The rejection by the examiner, affirmed by the board, is *reversed*. The case is remanded with respect to the board's added ground of rejection for further proceedings consistent with this opinion.

Reversed and remanded

ALMOND, Judge (concurring).

The jurisdiction of this court in ex parte patent cases is limited to appellate review of a "decision of the Board of Appeals". 35 U.S.C. § 141, 28 U.S.C. § 1542. Whether a panel *purporting* to render a decision on behalf of the Board of Appeals is capable of rendering a *valid* decision depends upon whether that "board" panel is constituted in accordance with 35 U.S.C. § 7. If a given panel is clearly illegally constituted in violation of the terms of section 7, neither the Commissioner of Patents nor any other Patent Office executive could make any decision of such a panel into a valid "decision of the Board of Appeals". To permit this would be to allow administrative officials to override the clear intent of Congress as expressed in the Patent Act of 1952.

I regret that I cannot agree with the majority's decision that this court is precluded from questioning the decision of the First Assistant Commissioner that the decision of the "board" panel in this case is a binding decision of the Board of Appeals. In my view, the majority has expanded the jurisdiction of this court of limited jurisdiction to cover review of not only (1) decisions of the

---

8. On how the Patent Office internally divides the determination of questions relating to patent applications between the board and the Commissioner, which in turn determines the appropriate route of review thereof, see Sec. 1201, Manual of Patent Examining Procedure and Rules of Practice 181 and 191.

Board of Appeals but also (2) decisions which the Commissioner represents to be decisions of the Board of Appeals, regardless of whether or not they are legally such.

I am not concerned with whether appellant raised the issue of jurisdiction either in the Patent Office or before this court, or with whether the issue is covered by his Reasons of Appeal, or with whether appellant abandoned the issue. It is too well-settled to require citation of authority that jurisdiction of the subject matter is *never* waived in a pending case. This is the unvarying rule even in courts of general jurisdiction, and it should be applicable with special force in this court of limited jurisdiction.

It would also be a matter of no concern if appellant, the Commissioner, and counsel for both parties all agreed that this court has jurisdiction of the subject matter of this appeal. The parties before a Federal court cannot confer appellate jurisdiction by their mere consent; only Congress can do so. Since Congress has confined our jurisdiction in ex parte patent cases to appellate review of a "decision of the Board of Appeals" under section 141, I believe we should consider the issue of whether the questionable "board" panel in the present case was legally constituted under section 7, so that it could conceivably render a valid decision on behalf of the "Board of Appeals." If the "board" panel could not do so because of its illegal composition, this court would lack jurisdiction of the subject matter under the statute.

The pertinent portion of 35 U.S.C. § 7 is set forth in a footnote to the majority opinion. Especially important is the proviso that "[n]ot more than one such primary examiner shall be a member of the Board of Appeals hearing an appeal."

I find no patent ambiguity either in the quoted proviso or elsewhere in section 7. To the contrary, the terms are clear, plain, and unambiguous. In such a situation it is well settled that recourse to legislative history is precluded. Lake County v. Rollins, 130 U.S. 662, 670–671, 9 S.Ct. 651, 32 L.Ed. 1060;

United States v. Missouri Pacific Railroad Co., 278 U.S. 269, 277–278, 49 S.Ct. 133, 73 L.Ed. 322; Cohn & Lewis v. United States, 25 CCPA 220, 226; United States v. Kung Chen Fur Corp., 188 F.2d 577, 584, 38 CCPA 107, 117.

The "board" panel whose decision is on appeal here consisted of a regular member of the Board of Appeals with the rank of examiner-in-chief, a primary examiner, and a supervisory examiner (of higher grade than a primary examiner). The statute, 35 U.S.C. § 7, specifically provides that the Commissioner "may designate any patent examiner of the primary examiner grade or higher" as an acting examiner-in-chief, and that any "examiner so designated shall be qualified to act as a member of the Board of Appeals." The only other statutory limitation of significance on the facts of this case is the aforementioned proviso that "[n]ot more than one such primary examiner shall be a member of the Board of Appeals hearing an appeal." Only one primary examiner sat on the "board" panel whose decision is here on appeal. Therefore, I think that the panel was legally constituted in accordance with the unambiguous terms of section 7. Ex parte Beyerstedt, 103 USPQ 189 (Bd.Appls.1952). Consequently, its decision is entitled to be regarded as a "decision of the Board of Appeals" which we have statutory jurisdiction to review.

I think it should be mentioned that, while individual Congressmen or members of committees might well have intended for the proviso to read "not more than one such *designated* examiner shall be a member of the Board of Appeals," the actual language used in the statute is clear and plain to the effect that "[n]ot more than one such *primary* examiner shall be a member" of a "Board of Appeals" panel. The class of "designated" examiners-in-chief would clearly include both (1) primary examiners and (2) examiners of higher grade than primary examiners. Since Congress enacted a statute containing the unambiguous terms "primary examiner" in the proviso, the statute must be held to

mean exactly what it says, notwithstanding the strong possibility that a minority of individual Congressmen and committee members may have intended the expression in the proviso to read "designated examiner" or "acting examiner-in-chief."

For the above reasons, I have considered the merits of this controversy, and I agree with the majority on the merits.

SMITH, Judge (dissenting).

The majority opinion of this court rests on the novel concept that an Article III Federal Court does not have jurisdiction to inquire into the legality of an administrative quasi-judicial board whose decision it has been requested to review. This concept is unsupported by authority or precedent and seems to me to be lacking in both reason and logic. The power to inquire into the legality of such a board is a necessary and inherent power of the reviewing court. Such power is the court's only safeguard against putting its judicial imprimatur on a legal nullity. Our obligation is to dispose of the present controversy in a judicial matter to the end that the duty of this court will not be compromised. As we recently stated, in In re Fischer, 360 F.2d 230, 231, 53 CCPA 1211:

> * * * The judicial nature of the proceedings in this court, no matter at what stage, is no longer in question. Lurk v. United States, 370 U.S. 530, [82 S.Ct. 1459, 8 L.Ed.2d 671] (1962) and Brenner v. Manson, 383 U.S. 519, [86 S.Ct. 1033, 16 L.Ed.2d 69] (1966). As stated by the Supreme Court, the bulk of this court's work involves the disposition of cases arising under Article III of the Constitution, that is cases arising under Federal law and cases to which the United States is a party. *These cases and controversies are and must be disposed of in a judicial manner.* * * * [Emphasis added.]

Three "principal reasons" are advanced to support the majority position:

(1) The question *was not raised* on this appeal by appellant;

(2) having raised the question in the Patent Office, he *abandoned* it by not arguing it before us (except as we insisted on his doing so at the reargument); and

(3) our *limited statutory authority* precludes our consideration of the question.

While Judge ALMOND and I differ as to how the issue of the legal competency of the board is to be resolved, we have no differences as to the inherent authority of this court to pass upon the issue here raised.

As I see it, the fallacy in the majority opinion results from confusing the *issues* of an appeal, required to be raised under 35 U.S.C. § 141, with the basic *authority* of this court, wholly independent of any reason of appeal or other limitations defined in section 141, to consider whether an appeal lies from the "decision" rendered by an alleged illegally constituted tribunal.

*The Issue of Jurisdiction*

To emphasize the agreement between Judge Almond and myself on this issue, his concurring opinion contains the statement with which I am in full and entire agreement which I here quote and embody in this opinion:

> I am not concerned with whether appellant raised the issue of jurisdiction either in the Patent Office or before this court, or with whether the issue is covered by his Reasons of Appeal, or with whether appellant abandoned the issue. It is too well-settled to require citation of authority that jurisdiction of the subject matter is *never* waived in a pending case. This is the unvarying rule even in courts of general jurisdiction, and it should be applicable with special force in this court of limited jurisdiction.

> It would also be a matter of no concern if appellant, the Commissioner, and counsel for both parties all agreed that this court has jurisdiction of the subject matter of this appeal. The parties before a Federal court cannot confer appellate jurisdiction by their

mere consent; only Congress can do so. Since Congress has confined our jurisdiction in ex parte patent cases to appellate review of a "decision of the Board of Appeals" under section 141, I believe we should consider the issue of whether the questionable "board" panel in the present case was legally constituted under section 7, so that it could conceivably render a valid decision on behalf of the "Board of Appeals." If the "board" panel could not do so because of its illegal composition, this court would lack jurisdiction of the subject matter under the statute.

The basic consideration to which we must give effect, it seems to me, is set forth in the following statement from 5 C.J.S. Appeal & Error § 1355, Want of Jurisdiction (1958):

> Inasmuch as lack of jurisdiction in the appellate court renders any decision which it might make on the merits a nullity, if such lack of jurisdiction is patent, or can be readily ascertained by an examination of the record, it warrants the dismissal * * * (citations omitted, 9 columns of cases).

The thought that our decision on the merits of this appeal may be a nullity is appalling. Yet the majority requires the court to proceed to precisely this end. What we have reviewed and the majority decision thereon may well be a nullity.

The alleged jurisdictional defect here "can be readily ascertained by an examination of the record." The composition of the board is stated in the record and the statute is before us. Further, appellant has raised the issue below as to the legality of the board. However, the majority proceeds upon the assumption that in expressing a contrary view on this point one is creating issues and acting outside the scope of authority vested in this court. I do not accept this premise but remain of the view that the issue of jurisdiction existed in this case from the moment the members of the board panel were designated by the Commissioner. This being true, it is my view that this court has no jurisdiction to consider the merits of the appeal for "An appeal from an inferior court or tribunal which has no jurisdiction of a cause confers no jurisdiction on the appellate court", 4 C.J.S. Appeal & Error § 41 (1957). Our jurisdiction as to this issue extends as far as the jurisdiction of any Article III Federal appellate court. "[T]he appellate court has jurisdiction to determine the lack of jurisdiction of the lower court." Id. at pp. 160–161, citations omitted. An appellate court which lacks jurisdiction cannot acquire it by its decisions or otherwise. Because jurisdiction here depends on the statute, consent, agreement, stipulation, waiver or abandonment cannot operate to confer jurisdiction. 4 C.J.S. Appeal & Error §§ 42–44 (1957).

I do not agree with the underlying view of the majority that the determination of the absence or presence of jurisdiction in this sense has been restricted by 35 U.S.C. § 141. Instead, it is my view that:

> The appellate court has the duty to determine the question of jurisdiction on its own motion, and it will not ignore a want of jurisdiction because the question is not raised or discussed by either party. (Citations omitted, 15 columns of cases). 4 C.J.S. Appeal & Error § 345 Determination of Questions of Jurisdiction.

In footnote 2 of the majority opinion, there is the generalization that Judge Almond has injected confusion into this matter by maintaining we have no jurisdiction over the subject matter. Lest my views be found similarly "confusing," I shall delineate precisely the type jurisdiction to which I refer. In approaching this task I am well aware of Justice Frankfurter's admonishment that "Jurisdiction" is indeed "a verbal coat of too many colors." United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 39, 73 S.Ct. 67, 70, 97 L.Ed. 54 (1952) (dissenting opinion).

Jurisdiction in the sense in which I have used it and shall use it here is the power to hear and determine the con-

troversy presented, in a given set of circumstances. In re National Labor Relations Board, 304 U.S. 486, 494, 58 S.Ct. 1001, 82 L.Ed. 1482 (1938). A more general definition is that in 21 C.J.S. Courts § 15 (1940):

> The jurisdiction of a court is in a broad sense its power to hear and determine controversies, and in a more restricted sense its power to adjudicate a particular case.

In In re National Labor Relations Board, supra, the issue was whether the Court of Appeals was without power to determine a given controversy involving the Labor Board. After the above statement concerning jurisdiction, the opinion continues:

> * * * A court has jurisdiction, in another use of the term, to examine the question whether that power is conferred upon it in the circumstances disclosed but if it finds such power is not granted it lacks jurisdiction of the subject matter and must refrain from any adjudication of rights in connection therewith. 304 U.S. at 494, 58 S.Ct. at 1005.

While an appeal had been filed from an order of the labor board, the transcript of record had not been filed by the labor board as required by law. The court found that the Court of Appeals was without power to determine the controversy.

Whether jurisdiction is defined as the power to review only *valid* decisions or whether it is viewed as the power to review only that subject matter which inures from a valid decision, the same result is reached. In support of Judge Almond, it would seem to be the better view that subject matter inuring from "decisions" of illegally constituted board of appeals is beyond our power of review. Thus I have no quarrel with, nor do I find confusion in, Judge Almond's conclusion that decisions by illegally constituted boards are "subject matter" over which we lack jurisdiction to review. And insofar as the jurisdiction in issue here depends on a statute, it may be

raised for the first time on appeal "since jurisdiction of subject matter cannot be waived or conferred by the parties". 4 C.J.S. Appeal & Error §§ 234, 242 (1957). Here, of course, an objection was made below.

In principle, I see no distinction between this court and the Federal Circuit Courts of Appeals concerning the fact that each is a court of limited appellate jurisdiction. Congress has provided, 28 U.S.C. § 1291, that "The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States * * *." Numerous decisions are available to support the proposition that courts of appeal have both the jurisdiction and the duty to determine whether they have the power to hear and determine the controversy sought to be presented, that the issue of jurisdiction need not be raised by the parties, that the parties cannot confer jurisdiction, and that lack of jurisdiction in the lower court requires that the appeal be dismissed. See 28 U.S.C.Annot. § 1291, notes 7, 8, 12, 13, 16, 17, 255, 256, 294, 327; 28 U.S.C.Annot. § 1331, notes 298–299. The above principles are indeed, in Judge Almond's view, "too well settled" to require the citation of authorities.

The basic consideration, which transcends all other considerations, it seems to me, is that our jurisdiction does not extend to reviewing the merits of decisions rendered by a legally incompetent board of appeals. "Decisions" which as a matter of law are a legal nullity are beyond the scope of our powers of review. See, e. g., Restatement of Judgments § 7, Comment (f).

The majority opinion fails to honor this basic consideration. Instead, it gives controlling effect to technical procedural considerations. To me such considerations are subservient at best, for otherwise, under the guise of restricting appellate review (as appellate courts should lest they be accused of unlawfully expanding their powers of review, 21 C.J.S. Courts § 28 (1940)), the majority actually has expanded the appellate re-

view of this court to anything a board of appeals denominates a "decision," regardless of the legality of the board. This conclusion is inevitable as the majority gratuitously demonstrates to the Patent Office that the solution to its dilemma insofar as review by this court is concerned is simply to recognize the Commissioner of Patents as the only one to review and pass on challenges to the composition of boards of appeals.

The majority clearly suggests that by following this course of action there will never be a "decision" by a board as to its own legal competency, and hence no basis for an appellate review of the matter in this court. This, it seems to me, approves the novel proposition that the extent of the Commissioner's authority is to be determined by the Commissioner and he may dictate what we can review notwithstanding the illegality of the board whose decision is appealed. I am unable to reconcile this position with the basic consideration that "Administrative determinations must have a basis in law and must be within the granted authority. * * * An agency may not finally decide the limits of its statutory power. That is a judicial function." Social Security Board v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946). Also, "The determination of the extent of authority given to a delegated agency by Congress is not left for the decision of him in whom authority is vested." Addison v. Holly Hill Co., 322 U.S. 607, 616, 64 S.Ct. 1215, 1220, 88 L.Ed. 1488 (1944). While I recognize the administrative inconvenience which would result from adoption of my views, the question for me is one of principle rather than expediency. It comes down to this: can the Commissioner by a decision so interpret his authority to designate boards of appeals as to divest this court of jurisdiction of this issue in an appeal from a decision of a board allegedly improperly designated by him? My view is that it is beyond the authority of the Commissioner thus to determine or limit the extent of this court's jurisdiction. I am unwilling to accept everything the Commissioner determines as being beyond our jurisdiction merely because it carries the label of Commissioner's decision.

Under the theory of the majority it may well be that some dissatisfied applicant will exercise his right under 35 U.S.C. § 145 to go to the District Court, D.C. where review of the Commissioner's action in setting up an illegal board may be gained. However, review here under 35 U.S.C. § 141 also is a right given the applicant. According to the majority, review is limited to what the board decided. This seems to limit an applicant's statutory rights and subject him to the delay and expense of multiple proceedings. The majority here would require, as I see it, that an applicant, not desiring a trial de novo in the district court on the merits, but wishing a review on the merits here, prosecute two actions simultaneously. The de novo proceeding in the district court would involve the question of the legality of the board and an appeal here would concern the issue decided by such board. See 35 U.S.C. § 141, 28 U.S.C. § 1542: Cf. Two Guys from Harrison-Allentown, Inc. v. McGinley, 273 F.2d 954 (3rd Cir. 1959). It seems to me that the reasoning of the majority seriously impairs an appellant's right of appeal to this court, beyond any limitations I find in the statute, see 28 U.S.C. § 1542, "The Court of Customs and Patent Appeals shall have jurisdiction of appeals from *decisions* of: (1) the Board of Appeals". Manifestly, the statute means valid decisions.

### Reasons of Appeal

Is our decision on the issue of the composition of the board foreclosed because appellant failed to expressly delineate it in his reasons of appeal? The majority holds that it is. I do not agree. The general rule is that only those errors properly assigned or specified may be considered on appellate review, see Congress of Indus. Organizations v. McAdory, 325 U.S. 472, 65 S.Ct. 1395, 89 L.Ed. 1741 (1945); 5 C.J.S. Appeal & Error § 1218 (1958). However, the general rule is ordinarily not applied to

questions of jurisdiction. 5 C.J.S. Appeal & Error § 1221 (1958). And "Want of jurisdiction may be regarded as fundamental error which will be noticed, on review, without being assigned as error." 5 C.J.S. Appeal & Error § 1239b. Thus an appellate court should notice its own want of jurisdiction, see e. g., White v. Crandall, 105 Fla. 70, 137 So. 272, 143 So. 871 and authorities cited at 5 C.J.S. Appeal & Error § 1239b at fn. 48, or the want of jurisdiction in the lower court, see e. g., id. at fn. 49, citing decisions from 16 states.

The majority opinion refers the reader to In re LePage's, Inc., 312 F.2d 455, 50 CCPA 852, as authority for "our long-established position" concerning the failure to assign questions in the reasons of appeal. An examination of the opinion in *LePage's, Inc.*, shows that we at least considered then that jurisdictional matters may be raised "at any time." 312 F.2d at 456, 50 CCPA at 854. Judge Rich at that time was "not at all convinced that the absence of reasons [of appeal] is a 'jurisdictional' defect, depriving us of the power to act if we choose to do so." 312 F.2d at 458, 50 CCPA at 856.

In In re Gruschwitz, 320 F.2d 401, 50 CCPA 1498, cited by the majority as authority, we adhered to the decision in *LePage's, Inc.* Although it is my view that the question of the composition of the board transcends any reasons of appeal, it seems that the present record amply qualifies under the test then advocated by Judge Rich in dissent that: "The really significant intendment of the statute is that we are a court of *review* and are not to act in any case on *new* grounds which we originate but are to restrict ourselves * * * to passing on the legality of what has been decided below." 320 F.2d at 408, 50 CCPA at 1508.

### *The Legal Competency of the Board*

Returning now to the basic consideration, is the decision here in issue the decision of a legally incompetent board? I recognize the general rule that where

a judge or commissioner assumes to act under lawful authority and no objection is made to his authority when he exercises power within the limits prescribed by law, this authority cannot be assailed on appeal. 4 C.J.S. Appeal & Error § 258h (1957). The rule is otherwise where there is a want of authority because the judgment is void for want of jurisdiction. Ibid. The controlling question in determining whether authority exists is whether the person acting has been selected by the authority designated and in the manner prescribed by law. 48 C.J.S. Judges § 101e (1947).

The problem of whether a judge has acted under lawful authority has occurred most often in situations involving special judges, i. e., one who acts by virtue of special appointment. The rule is that where the selection of a special judge is not in accordance with the law there is no judge and the entire proceeding before him is a nullity. See, e. g., Annoni v. Blas Napal's Heirs, 94 F.2d 513 (1st Cir. 1938). The principle involved is more commonly recognized as the so called "de facto" doctrine. In order that there may be a de facto judge, there must be a de jure office to be filled. Norton v. Shelby County, 118 U.S. 425, 445, 6 S.Ct. 1121, 30 L.Ed. 178 (1886). And where there is no legal authority for the selection of a special judge, a person so attempting to act is neither a judge de jure nor a judge de facto and the proceedings are null and void. 48 C.J.S. Judges § 107 (1947). The necessary consequences are as follows:

> * * * Following the rule that there cannot be a de facto officer if a de jure officer is discharging the functions of the office in question, if the regular judge is presiding and assumes to act in the particular cause, a special judge irregularly appointed, who assumes to act, is not even a de facto judge. * * * Id. at p. 1130.

Before considering whether a valid relationship may be established between special judges and special panels, I think it appropriate to consider the Supreme Court's decision in Glidden Co. v. Zdanok,

370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1961) which also decided the companion case of Lurk v. United States. As my colleagues well know, Judge Jackson, a retired member of this court, was involved in the companion case. He was designated to preside over a criminal trial in the District Court of the District of Columbia and the validity of this designation was questioned in the Court of Appeals, D.C. Certiorari was granted by the Supreme Court (368 U.S. 814, 815, 82 S.Ct. 56, 7 L.Ed.2d 22) limited to the question "whether the judgment in either was vitiated by the respective participation" of the named judges. 370 U.S. at 533, 82 S.Ct. at 1463. The Supreme Court's opinion best explains and sets forth the point I wish to make, 370 U.S. at 535–536, 82 S.Ct. at 1464:

> No challenge to the authority of the judges was filed in the course of the proceedings before them in either case. The Solicitor General, who submitted briefs and arguments for the United States, has seized upon this circumstance to suggest that the petitioners should be precluded by the so-called *de facto* doctrine from questioning the validity of these designations for the first time on appeal.

Whatever may be the rule when a judge's authority is challenged at the earliest practicable moment as it was in United States v. American-Foreign S. S. Corp., 363 U.S. 685 [80 S.Ct. 1336, 4 L.Ed.2d 1491], in other circumstances involving judicial authority this Court has described it as well settled "that where there is an office to be filled and one, acting under color of authority fills the office and discharges its duties, his actions are those of an officer *de facto,* and binding upon the public." McDowell v. United States, 159 U.S. 596, 602 [16 S.Ct. 111, 113, 40 L.Ed. 271]. The rule is founded upon an obviously sound policy of preventing litigants from abiding the outcome of a lawsuit and then overturning it if adverse upon a technicality of which they were previously aware. Although a United States Attorney may be permitted on behalf of the public to upset an order issued upon defective authority, Frad v. Kelly, 302 U.S. 312 [58 S.Ct. 188, 82 L.Ed. 282], a private litigant ordinarily may not. Ball v. United States, 140 U.S. 118, 128–129 [11 S. Ct. 761, 764, 765, 35 L.Ed. 377].

The rule does not obtain, of course, when the alleged defect of authority operates also as a limitation on this Court's appellate jurisdiction. Ayrshire Collieries Corp. v. United States, 331 U.S. 132 [67 S.Ct. 1168, 91 L.Ed. 1391] (three-judge court); United States v. Emholt, 105 U.S. 414 [26 L. Ed. 1077] (certificate of divided opinion). In other circumstances as well, when the statute claimed to restrict authority is not merely technical but embodies a strong policy concerning the proper administration of judicial business, this Court has treated the alleged defect as "jurisdictional" and agreed to consider it on direct review even though not raised at the earliest practicable opportunity. E. g., American Construction Co. v. Jacksonville, T. & K. W. R. Co., 148 U. S. 372, 387–388, [13 S.Ct. 758, 764, 765, 37 L.Ed. 486].

I fail to see where there is room for argument when the *authority* of a special judge is challenged that the challenge be *timely* or that the de facto doctrine is applicable. The clear question presented was whether the authority designating Judge Jackson was valid and exercised in accordance with law. Stripping the instant appeal to its essentials, the question here is not whether the board acted as a de facto body by virtue of its designation by the Commissioner. The question is whether the Commissioner has authority to designate boards as composed in the instant case. If not, then there can be no exercise of lawful authority by such boards because the law has not created or provided for such boards.

May meaningful distinctions requiring an opposite result be drawn between special federal judges and designated ex-

aminers-in-chief; or panels of federal judges and Patent Office boards? I think not. First, consider panels of federal judges and Patent Office boards. It has been established that where the law requires that a controversy be determined by a prescribed panel of federal judges, the judgment of a panel composed otherwise than provided by law must be vacated. United States v. American-Foreign SS. Corp., 363 U.S. 685, 80 S.Ct. 1336 (1960). Herein Judge Medina participated in an en banc hearing, 28 U.S.C. § 46(c). The decision was rendered after Judge Medina retired. Because the statute provided that a "court en banc shall consist of all active circuit judges of the circuit", the court found that "a retired circuit judge is without power to participate," 363 U.S. at 691, 80 S.Ct. at 1340, and the judgment was vacated. Significantly, the court noted that the policy of having only active circuit judges determine the major doctrinal trends should be given effect. The competence of Judge Medina was not questioned. Rather, the question was whether the panel was lawfully composed. Here, as discussed infra, there exists a definite policy that temporary examiners-in-chief be designated *only* when necessary in view of the work load and that appeals be heard by examiners-in-chief regularly appointed.

In Ayrshire Collieries Corp. v. United States, 331 U.S. 132, 67 S.Ct. 1168 (1947), a three judge court was empaneled concerning a controversy involving the enforcement of an order of the Interstate Commerce Commission. While three judges participated in the hearing, because of one member's illness only two judges participated in the judgment. The court found that the judgment entered by the two judges was void and without statutory authority. According to the court, "we have no alternative but to vacate the judgment and dismiss the appeal." 331 U.S. at 144, 67 S.Ct. at 1174. The Commissioner of Patents was faced with the same fact situation concerning a retiring board member after hearing and before decision in Ex parte Nichols, 78 USPQ 288 (Com.Pat.1947). Appellant there argued that in view of the *Ayrshire* decision, "decisions" of 2-member boards were void and without statutory authority. The Commissioner designated a 3-member board to hear the appeal, 78 USPQ 295 (Bd.App.1947). The parties had no difficulty in appreciating that the issue was whether an appeal would lie from a defect in the board's composition. The solution was to designate a different board.

I find it clear from the decisions in *Ayrshire* and *American-Foreign SS.* that a panel of federal judges, not constituted according to law, acts without authority. Should a panel of the Board of Appeals be treated differently? I think not as this appears to have been settled in the leading case of Norton v. Shelby, supra. Therein the Supreme Court had before it the question of the legal effect of the actions of a state board of commissioners. The Supreme Court stated it was "relieved from the necessity of passing" on the question of the "lawful existence and authority of the county commissioners," 118 U.S. at 436, 6 S.Ct. at 1122 as the highest court of the state had determined that the law passed by the state legislature creating the board was null and void. I would inject at this point that this is the question that I maintain is before us: the lawful existence and authority of certain panels of the Board of Appeals. The Supreme Court was faced with the argument that the board was at least de facto in nature prior to the decision of the state court. In answer, the opinion states, 118 U.S. at 441, 444, 6 S.Ct. at 1125:

> But it is contended that if the act creating the board was void, and the commissioners were not officers *de jure,* they were nevertheless officers *de facto,* and that the acts of the board as a *de facto* court are binding upon the county. This contention is met by the fact that there can be no officer, either *de jure* or *de facto,* if there be no office to fill. As the act attempting to create the office of commissioner

never became a law, the office never came into existence. Some persons pretended that they held the office, but the law never recognized their pretensions, nor did the supreme court of the state. Whenever such pretensions were considered in that court, they were declared to be without any legal foundation, and the commissioners were held to be usurpers.

\* \* \* \* \* \*

Numerous cases are cited in which expressions are used which, read apart from the facts of the cases, seemingly give support to the position of counsel. But, when read in connection with the facts, they will be seen to apply only to the invalidity, irregularity, or unconstitutionality of the mode by which the party was appointed or elected to a legally existing office. None of them sanctions the doctrine that there can be a *de facto* office under a constitutional government, and that the acts of the incumbent are entitled to consideration as valid acts of a *de facto* officer. \* \* \*

Since the question has been raised that the board is illegally constituted and the Commissioner has no authority to designate such boards, I fail to see how we can hide behind timeliness, abandonment or failure to assign it as error.

One last relationship remains to be examined. Should the result be different because the cases above did not involve a board or panel as herein involved? The majority opinion infers that we are here dealing with an "invalid appointment" and refers the reader to United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 73 S.Ct. 67 (1952). This is clearly not the situation before the court as no challenge has been raised as to the competence or appointment of any member of the board. We are, to repeat, concerned with the authority of the Commissioner to designate such *boards,* not individual members, and the lawfulness of *boards* so designated.

The decision in *Tucker* has some value but for a different reason. It held that the appointment of a hearing examiner (comparable to a patent examiner?) contrary to certain terms of the Administrative Procedures Act as set forth in the opinion, was not such an irregularity which would deprive the Commission "of power or jurisdiction, so that even in the absence of timely objection its order should be set aside as a nullity." 344 U.S. at 38, 73 S.Ct. at 69. Even in the *Tucker* case a *timely* objection would have been honored! Here objection was *not* made in an appellate court for the first time, as in *Tucker.*

Also, it is clear we are not dealing here with persons appointed according to the Administrative Procedure Act; we are here dealing with persons who, by virtue of regular appointment, are appointed by "the President, by and with the advice and consent of the Senate." 35 U.S.C. § 3. They are an independent body whose tenure is not controlled by the Commissioner.

I do not therefore find the *Tucker* decision dispositive of the issue raised here. I think we should look for guidance from cases involving persons having more comparable, but higher, stature, i. e., federal judges and not examiners, where the question or issue involved was the *existence* of *authority* to designate *panels* and the lawfulness of the exercise of *power by the panel as an entity.*

I regret that I have been required to delve into the jurisdictional aspect of this case at such length. Whether the fault lies in an inability to articulate succinctly or the complexity of the question, I firmly believe that the majority errs in its reasoning in support of its conclusion that the legality of the board is not before us.

While I do not believe the issue can be avoided, I also believe that the issue is so important that it should be decided and "judicial ingenuity" should not be used to "find a way to escape it." Clay v. Sun Insurance Office, Ltd., 363 U.S. 207, 214, 80 S.Ct. 1222, 1227, 4 L.Ed. 2d 1170 (1960) (dissenting opinion).

*Interpretation of 35 U.S.C. § 7*

I will now consider the issue of the validity of the board. I do not agree with Judge Almond that the terms of 35 U.S.C. § 7 are unambiguous. A full statement of the rule or principle relied on by Judge Almond is found in 2 Sutherland, Statutory Construction § 4702 (3rd ed. 1943) and reads as follows:

§ 4702. Statutes clear and unambiguous—The existing law.

Although the following rules seem delusive and unsatisfactory to the author, they have been repeated so frequently in the judicial decisions, it is only fair to record them here:

"When the intention of the legislature is so apparent from the face of the statute that there can be no question as to its meaning, there is no room for construction."

"It is not allowable to interpret what has no need of interpretation."

"There is no safer nor better settled canon of interpretation than that when language is clear and unambiguous it must be held to mean what it plainly expresses."

These rules are, of course, appropriate when the words of a statute are plainly expressive of an intent not rendered dubious by the context of. the act. The court in interpreting the act must declare it according to the words of the act for they are in fact expressive of the sense and intent of the act and any other interpretation would thwart that interpretation. * * *

* * * * * *

One who contends that a section of an act must not be read literally must show either that some other section of the act expands or restricts its meaning, that the section itself is repugnant to the general purview of the act, or the act considered *in pari materia* with other acts, or with the legislative history of the subject matter, imports a different meaning. If the language is plain, unambiguous and uncontrolled by other parts of the act or other acts upon the same subject the court can-

not give it a different meaning. But the limited meaning of words will be disregarded when it is obvious from the act itself that the legislature intended that it be used in a different sense than its common meaning.

First, I do not find 35 U.S.C. § 7 "plainly expressive of an intent not rendered dubious by the context of the act." Second, I find that the main paragraph of section 7 restricts the meaning of the exception stated therein and that the exception, as construed by the Commissioner, is repugnant to the general purview of the section. Further, the legislative history imports the true meaning to be attributed to the exception in section 7.

The rules of statutory construction are numerous and frequently in conflict. Ascertaining the "legislative intent" can be most difficult. As to this latter term, Justice Frankfurter once stated in "Some Reflections on the Reading of Statutes", 47 Col.L.Rev. 528, 538 (1947):

* * * All these years I have avoided speaking of the "legislative intent" and I shall continue to be on my guard against using it. The objection to "intention" was indicated in a letter by Mr. Justice Holmes which the recipient kindly put at my disposal:

Only a day or two ago—when counsel talked of the intention of a legislature, I was indiscreet enough to say I don't care what their intention was. I only want to know what the words mean. Of course the phrase often is used to express a conviction not exactly thought out —that you construe a particular clause or expression by considering the whole instrument and any dominant purposes that it may express. In fact intention is a residuary clause intended to gather up whatever other aids there may be to interpretation beside the particular words and the dictionary.

If that is what the term means, it is better to use a less beclouding characterization. Legislation has an aim;

it seeks to obviate some mischief, to supply an inadequacy, to effect a change of policy, to formulate a plan of government. That aim, that policy is not drawn, like nitrogen, out of the air; it is evinced in the language of the statute, as read in the light of other external manifestations of purpose. That is what the judge must seek and effectuate, and he ought not to be led off the trail by tests that have overtones of subjective design. We are not concerned with anything subjective. We do not delve into the mind of legislators or their draftsmen, or committee members. \* \* \*

What is the aim of the statute, what is the policy sought to be effected and what do the words mean? Justice Frankfurter further commented:

> Often the purpose or policy that controls is not directly displayed in the particular enactment. Statutes cannot be read intelligently if the eye is closed to considerations evidenced in affiliated statutes, or in the known temper of legislative opinion. Thus, for example, it is not lightly to be presumed that Congress sought to infringe on "very sacred rights." This improbability will be a factor in determining whether language, though it should be so read if standing alone, was used to effect such a drastic change.

As to the meaning of a statute, Professor M. R. Cohen once stated, in "The Process of Judicial Legislation," from "Law and the Social Order" (1933), as follows:

> What is the meaning of a statute: The rule that courts must interpret the meaning of the statute rather than the intention of the legislature is frequently conceived as if it implied that the words of a statute are sufficient to determine every question that arises under it. This would lead to a revival of the stage of strict law in which the strictly literal meaning of words is followed no matter how unjust or absurd the consequences. Doubtless there are many who still believe juris-

tic interpretation to be a kind of magic whereby a whole body of law is made to spring out of a few words or phrases. But most modern jurists are outgrowing the superstitious awe of the printed word and its magic potency. The meaning of a statute consists in the system of social consequences to which it leads or of the solutions to all the possible social questions that can arise under it. These solutions or systems of consequences cannot be determined solely from the words used, but require a knowledge of the social conditions to which the law is to be applied as well as of the circumstances which led to its enactment. \* \* \*

Thus while I feel justified in relying on traditional rules of statutory "construction" which I believe fully support my conclusions as to the meaning of the exception to section 7, I also draw my conclusions from considerations advanced by the above writers for too often interpretation rests wholly on which rules are applied.

What is the meaning of the terms in 35 U.S.C. § 7 "any patent examiner of the primary examiner grade or higher". Further, what is the meaning of the terms, "No more than one such primary examiner shall be a member of the Board of Appeals hearing an appeal." Do the second terms designate a title or individual or do they designate the class defined in the first terms? Is there any connection between the terms used? Should the terms be taken literally or do they mean that patent examiners having a level of expertise substantially equal to or slightly above a primary examiner are singled out for special treatment? In other words, does the statute operate to insure boards having a given level of ability and experience or is it wholly dependent on job titles? If the latter is accepted as being correct, a reorganization of job titles in the Patent Office can insure that nearly all patent examiners would be "qualified" for designation as acting examiners-in-chief. A host of considerations such as the above com-

pel the conclusion that 35 U.S.C. § 7 is not "clear on its face."

The foregoing considerations but underscore what seems to me to be the patent ambiguity in the language of the statute before us. As such it seems to me we are required to ascertain, if we can, what the meaning of the words must be. Should the prohibitions in section 7 become but a "name game" in which the ambiguous term "primary examiner or higher" allows the Commissioner, by changing the names and responsibilities of Patent Office personnel, to circumvent the limitations on his authority spelled out in section 7?

The problem requires an initial consideration of the historical background of the present appeal procedure in the Patent Office. Such a consideration aids in understanding the entire question and placing it in its proper frame of reference. When so considered, we find the problem to have been a long standing one. The present controversy viewed in this context is little more than another gambit in what appears to have been a more or less continuing contest between Congress and Commissioners of Patents concerning an independent judicial or quasi-judicial review of the Commissioner's decisions refusing a patent to an applicant. An ably written and carefully documented history of this contest was prepared by now Examiner-in-Chief Federico (who happens to have been the only Presidential appointee on the board here involved) in an article entitled "Evolution of Patent Office Appeals," 22 J.P.O.S. 838–920 (1940). I have drawn freely from this article in the following portions of this opinion. As Mr. Federico points out, appeals from the actions of the officials charged with the granting of patents were not contemplated by the Patent Acts of 1790 and 1793. Statutory provisions for appeals as such first appeared in the Patent Act of July 4, 1836. The Senate Committee which introduced the bill resulting in the Act stated in its report:

> It is obvious that the power [to refuse patents in those cases where patents should not be granted] must, in the first instance, be exercised by the department charged with this branch of the public service. *But as it may not be thought proper to intrust its final exercise to the department, it is deemed advisable to provide for an occasional tribunal to which an appeal may be taken.*[3] [Emphasis added.]

3. Report of the select committee to take into consideration the state and condition of the Patent Office, and the laws relating to the issuing of patents for new and useful inventions and discoveries. 24th Congress, 1st Session, Senate Document No. 338, April 28, 1836. Reprinted at 18 J.P.O.S. 854, 858.

The review contemplated by this Act was an appeal to a board of three arbitrators called a "board of examiners." These three "arbitrators" were appointed by the Secretary of State for each case. It is significant to note that in this first appellate procedure, the "arbitrators" were not appointed by nor subservient to the Commissioner of Patents for their authority to act. This authority came directly from Congress through the Secretary of State. These "boards of examiners" were given authority to conduct hearings and, by a majority vote, to reverse the decision of the Commissioner of Patents in whole or in part. Their decision was to govern further proceedings.

The procedure provided by the Act of 1836 proved to be cumbersome and the Commissioner of Patents recommended certain changes in it which were made by Congress in the Patent Act of March 3, 1839. This Act provided that instead of the arbitrators provided in the Act of 1836, an appeal would lay directly to the Chief Justice of the District Court of D. C. He was directed to hear and determine the appeal "on the evidence produced before the Commissioner."

The Act of March 2, 1861, 12 Stat. 246, further modified the plan of appeals by providing for an initial appeal within the Patent Office. Section 2 of this Act provided a system of two appeals within the office, one from the examiner to a

board of three examiners-in-chief, and another appeal from this board to the Commissioner of Patents.

As pointed out by Mr. Federico in his article:

As a matter of fact this statute merely enacted into law and further developed a practice which had grown up, through necessity, over a period of years. There was an appeal to the Commissioner, and also a board of examiners, for some time before they appear in the law.

Mr. Federico also states:

Thus the Act of 1861 was only the culmination of the development which took place during the preceding years. The Act established by law the board which had grown up in the Office and made it an appellate tribunal. At the same time a separate appeal from the board to the Commissioner was enacted. Previous to the Act the board in effect acted for the Commissioner in an appeal to him and a separate appeal from the board to the Commissioner did not exist except possibly as the Commissioner might personally reconsider a case.

The changed status of the examiners, as a result of the statutory creation of the appeal from their decision should be noted.

Basically, this system of appeals remained in the law until it was further revised by the Act of 1927.

As early as 1870 there was a strong movement for abolishing the appeal to the judges outside the Patent Office. In his report for the year 1869, Commissioner of Patents Fisher summarized the case against what he termed the "now useless and mischievous" appeal to the courts. Mr. Federico sets forth in his article the case stated by Commissioner Fisher in the form of "ten counts." The "counts" pertinent to the present consideration are 2, 5 and 7 which read as follows:

2. There seems to be no propriety in a summary appeal from an executive to a judicial department; at all events, no such appeal is allowed from decisions of the Commissioner of Pensions, Internal Revenue, Land Office, Indian Affairs, or the Comptrollers of the Treasury, notwithstanding the great pecuniary interests involved in their decisions, and the fact that in no one of those Bureaus is such liberal provision made for appeals within the Office as in the Patent Office.

\* \* \* \* \* \*

5. The tendency of such a jurisdiction is to extend itself. Accordingly the judges have every year encroached more and more upon the executive duties of the Commissioner. The law gave an appeal in a few cases. Appeals are not taken and sustained in many; until it is asserted that the judge, and not the Commissioner, is the head of the Patent Office, and that he is authorized to interfere and to overrule the Commissioner in any order or rule which the latter may make or attempt to execute.

\* \* \* \* \* \*

7. If it be said that these matters ought not to rest in the judgment of the Commissioner, the answer is:

a. He is selected because of his supposed familiarity with the business transacted in the Patent Office, and is, therefore, more likely to be right than the judge, who is appointed without reference to mechanical knowledge or learning in patent law.

b. The fear that the Commissioner might err, would demand a further provision for an appeal from the judge, and so on ad infinitum, since both are human.

c. The Commissioner of Patents ought to be as competent to decide questions arising in the conduct of his office as are the heads of other like departments; and

d. An appeal from the Commissioner is in fact provided, and would exist, even if the present appeal were abolished; indeed, even the decision of the judge is not final. It is provided in sec. 10, act of March 3, 1839,

that the applicant may file a bill in equity in any circuit court having cognizance thereof, "where patents are refused for any reason whatever, either by the Commissioner of Patents or by the Chief Justice," and the complainant may obtain a decree authorizing the Commissioner to issue the patent.

It is interesting to inject at this point that the complaints thus voiced by Commissioner Fisher have not been stilled by the appeal procedure where actions of the Commissioner of Patents in refusing patents to applicants is subjected to an appellate review outside the Patent Office. Thus, Commissioner Fisher's theory that the Commissioner is "more likely to be right than a judge" can be said to be the philosophy which underlies the recently released report of The President's Commission on the Patent System. Section XIII contains the following:

> The Patent Office should be recognized as having technical and legal expertise, important in deciding questions of patentability. While a reviewing court certainly will have legal expertise, and perhaps general technical knowledge, it seldom will possess the particular technical skill in the art with which a Patent Office examiner is equipped. Further, it is only after both the examiner and the Board of Appeals have concurred in the refusal of a claim that the matter comes before a reviewing court. Such concurrence should not be rejected by the court unless the action is, in its judgment, clearly erroneous.

> This recommendation should settle the conflict over "scope of review," by defining the court's responsibility to be *review* of the Patent Office decision, rather than substitution of its own judgment. The court would determine only whether the Patent Office had reasonable basis for its decision, not whether a different decision logically could have been reached on the same record. The burden of persuasion would be on the applicant, and the Patent Office decision should not be reversed unless, in view of all of the evidence, the court has a thorough conviction that there was no reasonable basis for the decision.

Congress did not agree with the earlier critics of the appeal procedures and in the Act of July 8, 1870, retained an outside appeal in ex parte cases and provided that the appeal be taken to the Court of the District of Columbia sitting en banc. It made no changes in the internal office appeal procedure.

The resultant appeal procedure became complicated, costly and time consuming and numerous studies were made prior to the Act of March 2, 1927. This Act made a major change in the Board of Appeals which, as outlined by Mr. Federico in his article, was:

> Within the Patent Office the two appeals, to the Board of Examiners-in-chief and from the latter to the Commissioner, were replaced by a single appeal, this single appeal being to a Board of Appeals constituted by the Commissioner, the Assistant Commissioners, and the Examiners-in-Chief. This Board was empowered to hear appeals from the adverse actions of examiners upon applications for patents, and from decisions in interference cases. The act specifies that each appeal shall be heard by at least three members of the Board of Appeals.

From the foregoing, it seems that there has been an insistent public demand which Congress has recognized to provide for some type of independent appeal from the decisions of the Commissioner of Patents which demand seems not to have been shared by all the Commissioners of Patents. Congress must have considered this public demand to be of importance to have persisted in providing for independent appeals even in the face of criticisms such as those voiced by Commissioner Fisher.

One clearly detects in this recital of historical background the persistence of demand for independence of the tribunal designated to hear appeals from the decisions of the Commissioner of Patents

refusing patents to applicants. The concept of independence in such appeals even within the Patent Office is culminated and clearly articulated in the Act of March 2, 1927 which provided for presidential appointment of the examiners-in-chief, with the advice and consent of the Senate.

It is against this historical background that we must evaluate the meaning and impact of the terms used in 35 U.S.C. § 7. To that end, I shall now consider the history of this provision.

### History of 35 U.S.C. § 7

Congress in enacting 35 U.S.C. § 7 provided, as a matter of general policy, for a review of adverse decisions of examiners upon applications for patents, by a board of appeals consisting of the Commissioner, the assistant commissioners and the examiners-in-chief and provided in this section that:

> The examiners-in-chief shall be persons of competent legal knowledge and scientific ability. The Commissioner, the assistant commissioners, and the examiners-in-chief shall constitute a Board of Appeals, which, on written appeal of the applicant, shall review adverse decisions of examiners upon applications for patents. Each appeal shall be heard by at least three members of the Board of Appeals, the members hearing such appeal to be designated by the Commissioner. The Board of Appeals has sole power to grant rehearings.

A reference to 35 U.S.C. § 3 shows that each official thus named is an official "appointed by the President, by and with the advice and consent of the Senate." Beginning with the Act of March 2, 1927, Congress provided that boards of appeal must consist entirely of persons whose authority to act depended upon Presidential appointment and Senate confirmation, assuring an independent tribunal.

The first paragraph of section 7 has not been changed in substance since 1927. It therefore may properly be considered as stating the general policy of Congress in providing for an independent appellate type of review within the Patent Office.

The second paragraph of section 7 is a newer provision and states an exception to the requirements of section 3. It concerns the appointment under special circumstances of acting examiners-in-chief without requiring Presidential appointment and Senate confirmation. Instead, such acting examiners-in-chief are to be designated by the Commissioner under the therein specially stated circumstances. This exception in par. 2 of section 7 thus gives the Commissioner limited authority to name acting examiners-in-chief and limits the use he may make of them in designating particular panels of the Board of Appeals. It becomes necessary, therefore, to examine the history and background of this second paragraph of section 7 to determine whether Congress intended the exception therein stated to take precedence over and change the long standing general plan of independent appellate review we find clearly stated in paragraph 1 of section 7.

The exception provided in par. 2 of present section 7 first appeared in 1945 in H.R. 4080, 79th Cong., 1st Sess.H.R. Rep.No. 1030, 79th Cong., 1st Sess., p. 1, stated the purpose of the bill as follows:

> The purpose of this bill is to increase the size of the Patent Office Board of Appeals by empowering the Commissioner of Patents to designate from time to time, or at any time, one or more primary examiners or law examiners of that office to serve as examiners in chief for periods of time not exceeding 30 days in any calendar year.

In support of the bill, after noting the increased number of appeals to the board, the following appears in H.R.Rep.No. 1030, at p. 2:

> By reason of their training and experience, principal examiners and law examiners are peculiarly fitted to serve as examiners in chief. * * * Also, it is believed that their services on the Board will provide opportunities for

them to gain wider knowledge of the practices obtaining in divisions of the Patent Office other than their own, and of the arts and sciences generally as they develop and are exemplified in pending applications for patents, as well as opportunities for them to demonstrate their abilities for future appointments as full examiners in chief.

The pertinent portion of the bill reads:

Provided, That the primary examiners and the law examiners of the Patent Office shall be authorized to serve as examiners in chief, but no such examiner shall so serve for more than thirty days in any calendar year and then only by direction of the Commissioner of Patents.

The above bill, after passing the House of Representatives, was sent to the Senate where the bill was amended to read as follows:

That notwithstanding the provisions of section 476 of the Revised Statutes (U.S.C., title 35, sec. 2), the Commissioner of Patents is authorized to designate examiners of the principal examiner grade or higher, having the requisite ability, to serve as examiners in chief and such examiners so designated shall be fully qualified to act as members of the board of appeals constituted by section 482 of the Revised Statutes (U.S.C., title 35, sec. 7): *Provided*, That no such examiner shall so serve for more than ninety days in any calendar year: *And provided further*, That not more than one such examiner shall be among the members of the board of appeals hearing an appeal.

Sec. 2. This Act shall take effect on the date of approval and shall expire three years after such date.

S.Rep.No. 1101, 79th Cong., 2nd Sess., repeated the above statements in H.R. 1030 and expressly stated, at p. 2:

* * * Cases are heard by three members of the Board of Appeals and the amended measure provides that not more than one of these shall be a designated examiner.

The above amended bill was subsequently passed by both the Senate and the House of Representatives. See Conf.Rep.No. 2695, 79th Cong., 2nd Sess. (1946).

It is clear from the above, and neither party argues otherwise, that under the above law Congress gave the Commissioner the authority to place only one examiner-in-chief designated by him under the exception to R.S. 476 (35 U.S.C. § 2) on any given board of appeals.

The limited nature of the first exception to section 7 is readily apparent. It was of temporary duration and designed to help eliminate the backlog of appeals to the board. Each acting examiner-in-chief was limited as to his period of service and required to sit with two regular board members. Each board hearing an appeal contained a majority of members whose designation was independent of the Commissioner's authority. The policy of an independent review in the Patent Office was preserved.

The above law (60 Stat. 873, 35 U.S.C. § 7) expired on August 7, 1949. In the same year S. 1172, 81st Cong., 1st Sess., was introduced. This bill provided for a permanent increase in the number of examiners-in-chief without providing for designated examiners-in-chief. After passing the Senate, the bill was amended in the House of Representatives to provide for designated examiners-in-chief. The finally enacted provision stated:

Section 482 of the Revised Statutes (35 U.S.C. 7) is amended by adding the following paragraph:

"The Commissioner, when in his discretion considered necessary to maintain the work of the board of appeals current, may designate any examiner of the primary examiner grade or higher, having the requisite ability, to serve as examiner in chief for periods not exceeding six months each, and any examiner so designated shall be qualified to act as a member of the board

of appeals. Not more than one primary examiner shall be among the members of the board of appeals hearing an appeal." 64 Stat. 11.

This bill was approved March 4, 1950.

H.R.Rep.No. 1617, 81st Cong., 2nd Sess., stated that the purpose of the amendment was to allow the Commissioner to designate examiners-in-chief "from time to time until the appellate work is current and then discontinue the temporary designations." U.S.Code Cong. Serv.1950, p. 1942. The report also contained the supporting reasons offered with respect to the previous act, quoted supra.

There is no evidence of any indication that Congress intended to change the previous law. The Senate Bill did not provide for designated examiners-in-chief and the House added the provision by amendment, referring to the temporary act passed in 1946. However, whereas the previous law stated only "one such examiner" could serve on a board, the 1950 law stated "not more than one primary examiner" could serve on a board.

In 1952, 35 U.S.C. § 7 was enacted. The language in para. 2 was changed to provide that "[n]ot more than one such primary examiner" may serve on a board. The preliminary draft did not provide for designated examiners-in-chief. See Proposed Revision and Amendment of the Patent Laws, Preliminary Draft, Comm. on the H.R. Judiciary 4 (1950). In H.R. 9133, 81st Cong., 2nd Sess., it was provided that the Commissioner could designate examiners-in-chief "of the grade GS–13 or higher" and "not more than one such GS–13 grade examiner shall" be on a board. In H.R. 3760, 82nd Cong., 1st Sess., the second bill introduced into Congress, the language was changed to that presently appearing in section 7. H.R.Rep.No. 1923, 82nd Cong., 2nd Sess. and S.Rep.No. 1979, 82nd Cong., 2nd Sess., U.S.Code Cong. & Admin.News 1952, p. 2394, commenting on H.R. 7794, 82nd Cong., 2nd Sess., the third bill in-

troduced into Congress, each state that "some changes in language have been made" in section 7. Thus, independent research fails to reveal anything of a definitive nature that Congress intended, except as above pointed out, to change the legal effect of the exception provided in the second paragraph of section 7.

The final legislation concerning section 7 originated in 1958 and 1959. In 1958, S. 1864, 85th Cong., 1st Sess., was introduced which expanded the number of permanent board members from nine to not more than fifteen and also established a new compensation rate for certain Patent Office officials. Concerning the proposed increase in board members in view of the increased number of appeals to the board, H.R.Rep.No. 2557, 85th Cong., 1st Sess., U.S.Code Cong. & Admin.News 1958, p. 5332, states:

> * * * With this increase [in appeals], it will be necessary not only to continue the practice of designating other examiners to serve temporary tours of duty on the Board of Appeals but also to increase the number so serving. While this measure is highly desirable as a means of adjusting manpower to take care of peak periods of fluctuating workload, it is felt that there should not be such a large number of temporary members. One reason is that these men are removed from their other duties, which disadvantageously affects the work of examination in the divisions from which they are drawn, and of course temporary members could not be as efficient as those serving permanently. It is accordingly proposed that the permanent members of the Board of Appeals be increased by not more than 6, raising the number from 9 to not more than 15. While the data submitted above shows that 15 members may not be sufficient to carry on the work of the Board of Appeals at the present increased level of the filing of appeals, a membership of 15 permanent members will reduce considerably the number of temporary members which need

to be assigned, and will allow for the possibility that when the task of reducing the backlog of applications pending before the examiners is accomplished the number of appeals filed may decrease to such an extent as to be capable of being handled by them alone, with possibly only an occasional temporary designation. The bill is so worded that the total number of 15 need not be filled when the workload so warrants.

The provision relating to temporary designations is retained since this is very useful for occasional assistance and also provides a means of testing prospective new members. * * *

Concerning the salary increase the report states:

* * * Appointments to these positions are recommended by the President and confirmed by the Senate. The duties and responsibilities combined with executive appointment requirements of these positions indicate that salaries in excess of those provided for career civil service employees are appropriate. Further justification for the salaries proposed in the bill is that these positions are unique among professional positions in Government in that they require the combination of the highest level, judicial and scientific attainment for the proper discharge of the responsibilities assigned to them by statute.

The quasi-judicial duties of the members of the Board of Appeals are the most difficult and exacting in the Patent Office. It is required by law that the examiners in chief be scientifically competent and trained in law. Their work has unusually great significance and importance in the technological and industrial development of this Nation. * * *

Of further interest are the comments of Congressman Libonati[1] made in the

House concerning the above bill, 104 Cong.Rec., Part 15, at 19,199:

Members, three in number, sit as a panel, hearing both oral and written argument. The panel studies the brief and arguments, rendering its decision. *No more than one designated member can sit on a panel.* One writes the decision—speaks with the second, then submits to the third person on the panel. This takes a great deal of time with much detail and extended delays. They have the last word—appeals are then taken to the Court of Customs and Patent Appeals and by suit de nova [sic] can be taken to the District Court of the United States for the District of Columbia.

This is a difficult work and the reputation of the Board must enjoy the highest reputation for personal integrity and judicial honesty in an office of first importance in the economy of the Nation. It enjoys the highest kind of confidences and secrets. The finest legal minds of international reputation practice before this tribunal. [Emphasis added.]

The basis for Congressman Libonati's statement that "No more than one designated member can sit on a panel," is found in the testimony of Robert C. Watson, then Commissioner of Patents, who testified before the House Judiciary Subcommittee No. 3, on July 30, 1958. Commissioner Watson was asked to spell out the appeal procedure in the Patent Office, including the selection of panels. Commissioner Watson stated that at that time 9 regular members and 10 designated members constituted the class from which panels were selected. He explained that the panel is comprised of 2 regular members and one designated member and *expressly pointed out that he could not appoint 2 designated members to serve on a panel of 3.* Mr. Sam W. Kingsley, then Personnel Officer of the Patent Office, and Mr. Leo P. Mc-

---

1. Roland V. Libonati of Illinois, at the time a ranking member of the House Judiciary Committee.

Cann, an examiner-in-chief of the board, who also testified, elaborated further as to the necessity of increasing the number of permanent examiners-in-chief.

Commissioner Watson's testimony is reflected in H.R. 2557, supra, wherein figures are set forth indicating the number of persons acting as board members from 1950 through 1957. The figures range from a high of 20.4 (1958) to a low 11.0 (1954). The report states "The number of men serving on patent appeal work during this period averaged 15 per year."

1n 1959 a salary bill concerning regular and designated examiners-in-chief was introduced, S. 1845, 86th Cong., 1st Sess., amending section 7. H.R.Rep.No. 1138, 86th Cong., 1st Sess., U.S.Code Cong. & Admin.News 1959, p. 2834, states in part:

A member of the Board of Appeals reviews appealed patent cases in any category of the sciences and technological arts which may involve claims where competent definitions of the exact contribution to the art are exceptionally difficult to make. His decisions may involve highly complicated matters, including interpretations of a very advanced, technical character relating to the latest developments in the diverse fields of mechanics, electricity, electronics, chemistry, electrochemistry, physics, atomic physics, drugs, etc. His decisions require exceptional knowledge of, and seasoned experience with, legal precedents, prior decisions of the Board, decisions of the U. S. Court of Customs and Patent Appeals, and decisions of the other Federal courts.

\* \* \* \* \* \*

A study of the duties and responsibilities required of examiners-in-chief, together with the high professional qualification requirements for their executive appointment to those positions, serve to accentuate the inadequacy of Classification Act salaries of only $13,970. *The quasi-judicial duties of the members of the Board of Ap-*

*peals are the most difficult and exacting in the Patent Office.* It is required that to be eligible for appointment, examiners-in-chief be scientifically competent and trained in the law. *Few of the career employees possessing this combination of professional abilities also possess the high level of judicial judgment required for successful performance of the scientific and legal decisions required of them.* Recommendations to the President for appointments of new members to the Board are made only after temporary detail assignments to determine the professional competence of the proposed appointee. [Emphasis added.]

There can be no question about the need for temporary or acting examiners-in-chief and the practical reality of having them appointed by the Commissioner when the circumstances are such as to require such appointment.

The basic issue here posed, however, is whether in providing for such temporary or acting examiners-in-chief, the meaning of the statute permits the Commissioner to erode its basic concept of an *independent* quasi-judicial review of his decisions. The practical operation of the system since the Commissioner was given this authority has been observed by Clesner and Clesner in their article, The Board of Appeals of the Patent Office— 40 J.P.O.S. 298 (1958), stating:

\* \* \* Due to the heavy workload there have been instances of primary examiners serving as acting examiners-in-chief for four out of five years. At present the Board consists of more acting members than appointed members. *This defeats the intent of judicial independence the Board may possess from its members being presidential appointees for life.* [Emphasis added.]

The above is all the available information I have found as to the intent of Congress concerning designated examiners-in-chief and the uses to be made of them. In summary, it seems clear that Congress regarded designated examiners-

in-chief as a temporary measure to reduce the backlog of appeals and, as such, regarded them to be an exception to the general provisions governing appointments of examiners-in-chief under 35 U.S.C. § 3 and the composition of regular boards of appeal under the first paragraph of 35 U.S.C. § 7. It also appears that Congress considered that examiners-in-chief designated by the Commissioner should be utilized only when a backlog existed and that this practice would cease when the regularly appointed examiners-in-chief could cope with the appeal load. These considerations underlie all the amendments proposed to present section 7 and clearly indicate that the second paragraph of section 7 is but an exception to section 3 and to the first paragraph of section 7. Congress also appears to have been of the view, since the inception of the provision permitting the Commissioner to designate examiners-in-chief, that not all patent examiners of the primary grade or higher would be suitably qualified to serve as examiners-in-chief and this, I think, emphasizes the significance of the Congressional enactment of the second paragraph of section 7 which places very definite limitations on the extent of the Commissioner's authority to use his designated examiners-in-chief on boards of appeal. In addition to the need for eliminating the Patent Office backlog, the stated purpose for utilizing designated examiners-in-chief also appears to have been as a "trying-out," or probationary period, as it were, to ascertain which of the examiners so serving were suitable for further consideration for Presidential appointment as regularly appointed examiners-in-chief. Congress clearly recognized that the duties of an examiner-in-chief were quasi-judicial in nature; that examiners-in-chief must be scientifically competent and trained in the law; and that appointments of new members to the board can best be made after service of the prospective appointee as a temporarily designated examiner-in-chief during which time an evaluation may be made of the professional competence of the proposed appointee. The ultimate responsibility for decision of appeals was, I think, to be vested in those examiners-in-chief whose authority to act was delegated to them by reason of Presidential appointment, and who were thus independent of the Commissioner as the source of their power and authority to act. It seems equally clear that the statute cannot mean that a majority or all of the members of any board of appeals should consist of examiners-in-chief designated by the Commissioner.

All the internal evidence and policy considerations in the foregoing seem to me to clearly establish that Congress did not intend to sanction any scheme of authorizing boards, a majority of whose members were examiners-in-chief designated by the Commissioner. It also seems clear to me that the changes in language made in section 7 do not permit more than one "primary examiner" acting by designation as an examiner-in-chief to serve on any one board.

I shall now consider Assistant Commissioner Reynolds' interpretation of the statute under which any number of examiners-in-chief, acting by designation of the Commissioner, may act on a given board so long as not more than one of them is of primary examiner grade. I shall first consider the statutes. As above set forth, it seems clear that in 1946 Congress intended and provided that but one designated examiner-in-chief could act on any given board of appeals panel. The 1950 provision for designated examiners-in-chief was added by amendment in the House to a Senate sponsored bill without any discussion as to whether a change in law was contemplated. Only a literal reading of the 1950 law in a vacuum supports the conclusion underlying Assistant Commissioner Reynolds' decision that Congress reversed its policy and so changed the limitation that it applied only to "primary examiners" designated as examiners-in-chief and did not apply if the designated examiner-in-chief had a grade "higher" than the primary examiner

grade. I cannot agree with Assistant Commissioner Reynolds that Congress intended to so change this limitation in the statute. To do so requires one to ignore and negate the contrary expressions of Congress in 1952 and 1958–59.

In 1952, Congress first employed the expression "such primary examiner" in the statute. I have not been able to ascertain whether such change was made as a "change in English" or whether that phrase was meant to include as a class examiners-in-chief designated by the Commissioner from "primary examiner grade or higher."

The Revisor's note refers to the changes made as "some changes in language" and does not suggest that any substantive changes were made in the section.

One thing which appears clearly is that Congress at all times has considered designated examiners-in-chief, *as a class*, to be a temporary expedient utilizing persons of unproven ability and its recognition that many of them, *regardless of grade*, might be unqualified for Presidential appointment under section 3 as examiners-in-chief.

I shall next consider the precedents which exist as to the construction of section 7. In Ex parte Beyerstedt, 103 USPQ 189 (Bd.App.1952) the board held that section 7 only prohibited more than one primary examiner designated as an examiner-in-chief from acting on a board. This decision arose under the terms of the 1950 law and the opinion of the board does not reveal any investigation as to congressional policy or intent. The decision was joined by two designated examiners-in-chief, with the regular board member writing the opinion.

I also note some forty decisions cited by the solicitor in his brief wherein two designated members sat on the board. No challenge as to the validity of the board was made in those cases. The solicitor argues:

It is submitted that, since the construction of a statute by an agency charged with its administration is ordinarily given great weight—U. S. v. Amer. Trucking Asso. 310 U.S. 534 [60 S.Ct. 1059, 84 L.Ed. 1345]—, no reason exists for disagreeing with or modifying the interpretation placed upon the statute by the Patent Office, as exemplified by the Commissioner's decision in the involved application.
\* \* \*

In *American Trucking* the Supreme Court *agreed* with the Interstate Commerce Commission's decision that its authority under the statute was *limited* to securing safety of operation. In answer to arguments urging an opposite construction, the court's opinion states, concerning legislative intent, "in fact the evidence points the other way." 310 U.S. at 548, 60 S.Ct. at 1066. Here, we are presented with an attempt to expand authority, in face of conflicting evidence and statutory limitations, by the construction placed on the statute by Assistant Commissioner Reynolds. Moreover, we are not bound by previous exercises of jurisdiction in cases in which power to act was not questioned. Brown Shoe Co. v. United States, 370 U.S. 294, 307, 363, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

The solicitor also argues that to hold the board to be improperly constituted would "cast a cloud" upon patents resulting from decisions of other boards similarly constituted. This consequence is at best argumentative and no authorities have been cited for our consideration in determining whether it is relevant to the issue of jurisdiction. As stated earlier, we are here dealing with an issue of jurisdiction as to which we have no choice but to consider this issue. The ultimate consequence of the decisions of such illegally constituted boards is the responsibility of the Commissioner, whose acts gave rise to the problem.

On the question of the effect of a finding of lack of jurisdiction in relation to previous judgments and decisions certain guidelines are found in Chicot County Dist. v. Baxter State Bank, 308 U.S.

371, 60 S.Ct. 317, 84 L.Ed. 329 (1940). The Supreme Court had previously declared a jurisdictional statute under which the district court had acted to be unconstitutional. Ashton v. Cameron County Water Imp. Dist., 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309 (1936). In *Chicot* it refused to set aside a final judgment and decision rendered before the statute was held unconstitutional. While district courts were without jurisdiction to entertain such matters after *Ashton*, all judgments which had become final before *Ashton* were binding on all parties and not subject to collateral attack. Viewed in retrospect, the district court did not have jurisdiction but the court stated, after extensive analysis, "The past cannot always be erased by a new judicial declaration." 308 U.S. at 374, 60 S.Ct. at 318. Previous judgments were thus valid.

The solicitor urges that the designation of boards is a matter of "discretion." However, in Federal Trade Comm. v. Raladam Co., 283 U.S. 643, 649, 51 S. Ct. 587, 590, 75 L.Ed. 1324 (1931) the Supreme Court stated:

> * * * Official powers cannot be extended beyond the terms and necessary implications of the grant. If broader powers be desirable, they must be conferred by Congress. They cannot be merely assumed by administrative officers; nor can they be created by the courts in the proper exercise of their judicial functions.

We cannot ignore or merely pay lip service to the fact that examiners-in-chief are appointed by the President with the advice and consent of the Senate and that they must be selected from a class of persons having competent legal knowledge and scientific ability. Compare Ramspeck v. Federal Trial Examiners Conf., 345 U.S. 128, 73 S.Ct. 570, 97 L. Ed. 872 (1953); United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 73 S.Ct. 67 (1952).

The safeguards which Congress enacted to insure an independent quasi-judicial type of review by the Board of Appeals must not be ignored. To do so is to legislate by administrative or judicial fiat and this is not a legitimate function either of the Commissioner of Patents or of this court. Pursued to its logical conclusion, the Commissioner's interpretation of the second paragraph of 35 U.S.C. § 7 could create boards of appeal composed entirely of examiners-in-chief designated by the Commissioner of Patents. The only limitation, according to the Commissioner's interpretation, is that not more than one of the so designated examiners-in-chief be of a "primary examiner" grade. It is significant, I think, that the designation of an examiner as "primary examiner" or title of higher grade is determined by the administrative regulations of the Patent Office. The particular name given from time to time to the functions of the members of the examining corps has been determined by the Commissioner by appropriate administrative order. Acting examiners-in-chief under the Commissioner's interpretation could be designated from any class of examiners having a title which suggests that they may have a grade higher than the primary examiner grade. Under the decision of Assistant Commissioner Reynolds a valid board of appeals could be composed of persons having little more expertise than a primary examiner so long as they have a "higher" grade. This could be in name only and perhaps be but remotely associated with the functions and skills required of one who becomes an examiner-in-chief by Presidential appointment. Entire boards could be selected from these "higher" classes of designated examiners-in-chief whose sole authority to act is derived from the Commissioner. What then becomes of the concept that the appeal in the Patent Office should be decided by boards, a majority of whose members are authorized to act by reason of Presidential appointment and Senate confirmation? Throughout the legislative history pertinent to the exception expressed in section 7 it is evident that Congress intended to provide an independent appeal and to this end provided

that not more than one examiner of primary grade could be designated on a given panel. The reasons are apparent. The primary examiner has the lowest level of experience and perhaps of expertise of those qualified to serve on the Board of Appeals. Since the appeal is taken from a decision made by another primary examiner it seems both reasonable and logical to require that the appeal board be composed of a majority of members whose qualifications to so act have been determined by the President with the advice and consent of the Senate and who may act independently of the Commissioner. Manifestly, wherein lies an independent review if a majority or the whole of the board lacks expertise, are acting on a trial basis and under the close scrutiny of the Commissioner, and are but a step removed or equal to the title of the person whose decision is under review? Independent review by superiors with expertise is in effect lost. I think the basic requirements of an independent appellate review simply would not be met under the interpretation here advanced by Assistant Commissioner Reynolds in upholding the legality of the board here in question. Further, under his interpretation, the limited authority now vested in the Commissioner would be extended beyond anything I have been able to ascertain was intended by Congress. In fact, my view is that it is contrary to the intent demonstrated.

Finding as I do on the record before us that the board below was improperly constituted in violation of the second paragraph of 35 U.S.C. § 7, I would find that no valid decision was rendered on appellant's appeal from the decision of the primary examiner. The purported decision entered by the board in this case is a legal nullity. It seems to me, therefore, to be our clear duty to dismiss the appeal for we are lacking in jurisdiction to proceed to a consideration of such a decision. Ayrshire Collieries Corp. v. United States, 331 U.S. 132, 144, 67 S. Ct. 1168, 91 L.Ed. 1391 (1947).

I would, therefore, dismiss the appeal.