54 CCPA

**Application of Martha TOMANEK, nee Kunitzer.**

**Patent Appeal No. 7692.**

United States Court of Customs and Patent Appeals.

May 4, 1967.

Rehearing Denied July 17, 1967.

James E. Bryan, Washington, D. C., for appellant.

Joseph Schimmel, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

WORLEY, Chief Judge.

This appeal is from the decision of the Board of Appeals affirming the examiner's rejection of composition claims 1–9 and process claims 10–12 and 14–19 in appellant's application [1] entitled "Developer for Electrostatic Latent Images."

The application describes and claims a method of, and compositions for, developing an electrostatic latent image. According to the specification and record, such an image is formed by uniformly charging (by corona discharge, for example) a photoconductive insulating layer in the dark, then photographically exposing the charged layer to a light pattern. Where light strikes, the photoconductive layer becomes conductive and the charges in that area "leak" away in proportion to the intensity of illumination, leaving an electrostatic latent image in the non-illuminated areas. It appears that the image is commonly "developed" by applying compositions including "toner" powders which temporarily adhere to larger "carrier" particles

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Serial No. 123,099, filed July 11, 1961.

and bear a charge or polarity opposite to that of the latent image. The "toner" powder is electrostatically attracted to image areas of opposite charge whereafter it may be permanently affixed, for example, by heating. The heavier "carrier" particles roll away under gravity forces.

According to appellant, the known developers "have the disadvantage that they do not uniformly develop image portions covering rather large areas, but are deposited only around the edges leaving the inside portions of such areas to all intents and purposes undeveloped." To solve that problem, appellant employs a so-called "double toner," as reflected in composition claim 1 and process claim 10:

1. A developer for electrostatic latent images *consisting* of a mixture of effective amounts of at least one *organic resinous toner* capable of acquiring a *positive* charge and at least one *inorganic toner*, of approximately the same effective particle size, capable of acquiring a *negative* charge, the charges acquired by the toners being not in excess of about 10 volts.

10. A method of developing an electrostatic latent image which *comprises* applying to the image a *mixture consisting of* effective amounts of at least one *organic resinous toner* having a *positive* charge and at least one *inorganic toner*, of approximately the same effective particle size, having a *negative* charge, the charges on the toners being not in excess of about 10 volts. (Emphasis supplied)

According to the specification, the "double toner" is applied to the electrostatic image "in known manner." The positively charged, fusible, organic, toner materials are drawn to image areas of negative charge where they are fixed by heat. The negatively charged inorganic materials adhere temporarily to image areas of no charge from which they may easily be removed, provided that the fixing temperature is maintained low enough to prevent melting of the photoconductive insulating layer. According to appellant, the claimed "double toners"

are advantageous because "they are capable of developing large areas and do not adhere merely to the edges of the image."

The examiner rejected the claims as unpatentable over the following prior art references:

Carlson I     2,221,776  Nov. 19,  1940.
Carlson II    2,297,691  Oct.   6,  1942.
Carlson III   2,940,934  June 14,  1960.
Sugarman      2,758,939  Aug. 14,  1956.
Wielicki      2,986,521  May  30,  1961.
Bixby         3,013,890  Dec. 19,  1961.
                  (filed July 8, 1958).

It is evident that the Patent Office regards Bixby as the principle reference against claims 1 and 10, the board agreeing with the examiner that Bixby "substantially" or "fully" meets the terms of those claims. The remaining references are mainly employed to demonstrate that certain specific developer materials recited in other claims were known in the art. Appellant argues here:

* * * There is only one reference which relates to * * * a "double toner", i. e., the patent to Bixby, * * * but the present invention distinguishes from * * * Bixby in two very important respects: (1) In Bixby it is essential to use a carrier whereas *no carrier* is employed in the developer of the present invention, and (2) one component of the "double toner" of the present invention is *inorganic* and, therefore infusible, whereas both toner components of the Bixby developer are organic and, therefore, fusible.

The examiner and board did not agree with appellant's characterization and interpretation of the Bixby disclosure, nor do we. With respect to argument (1) of appellant, it is true that the present claims, reciting a "developer * * * *consisting* of a *mixture* of * * * one organic resinous toner capable of acquiring a positive charge and * * * one inorganic toner * * * capable of acquiring a negative charge," verbally distinguish over those portions of Bixby's disclosure relating to the inclusion of "carrier" *particles in* his mixture of positively charged and negatively charged

toner particles. However, as the examiner and board correctly point out,[2] Bixby need not include carrier *particles in* his developer composition, but can use bristles of a brush, drum surfaces or sheet surfaces as "carriers" for application of the toner mixture to the latent image. While appellant does not directly controvert that finding of fact, she contends the present claims not only exclude the presence or use of particulate carriers but also exclude *any* "carrier," even the brush, drum or sheet "carrier" surfaces employed by Bixby. The examiner and board did not find that to be the case, and appellant's arguments here do not convince us of error in that decision.

That appellant's present construction of the claims is primarily an advocate's afterthought is further demonstrated by the disclosure of the specification, earlier quoted, that the toner mixture is applied to the latent image in "known manner." While it is not at all clear from the specification what "known manner" of distributing the toner mixture over the image is contemplated, it is evident that the use of a brush, drum or sheet, each of which is shown by Bixby and other references to be a very well "known manner" of applying toners to electrostatic images, is not excluded by the language of either the specification or the claims.

With regard to appellant's argument (2), it is true that Bixby discloses a toner mixture of positively and negatively charged particles in which both sets of particles *are* organic and fusible in nature. The examiner and board were of the view, however, that Bixby also discloses the use of mixtures of positively charged organic and negatively charged inorganic toner particles. To resolve those contentions, it is necessary to look at the Bixby disclosure in some detail. Bixby first discloses specific examples of resinous organic toners which are positively and negatively chargeable with respect to a polystyrene carrier surface:

\* \* \* suitable toner materials which are positive relative to the polystyrene are gilsonite [an asphalt material], either by itself or with Raven Beads carbon black to give a black toner; Amberol 800–P (a trade name of Rohn & Haas Co. for a synthetic resin) either with Hansa yellow (a trade name of General Dyestuff Corp.) for a yellow toner, or with Duplex Maroon lithol (a trade name of Calco Division of American Cyanamid Co.) for a red toner or with phthalocyanine blue for a blue toner. Suitable toner compositions which are negative relative to a polystyrene surface are Amberol F–71 (a trade name of Rohn & Haas Co. for a synthetic resin) with either Raven Beads carbon black or black iron oxide for a black toner.

\* \* \* In column 8, lines 35 to 46, describing hopper 25 containing a mixture of positively and negatively charged toners 26, and similarly in column 10, lines 1 to 21, describing a supply of a toner mixture 36 in reservoir 35, Bixby clearly teaches compositions which do not contain the argued carriers.

\* \* \* \* \* \*

We are also in agreement with the Examiner's position as to method claims 10, 11, 12 and 14 to 19. The term "comprises applying" does not preclude the Bixby expedient of applying the mixed toner particles, which have been given their positive or negative charge by means of nonparticulate carriers such as belts or drums. These embodiments of Bixby in our opinion fully meet the terms of appellant's claims.

2. The examiner stated:
\* \* \* Bixby teaches mixing the organic resin capable of acquiring a positive charge with the particles capable of acquiring a negative charge and which may be inorganic prior to contacting the toner particles with a "carrier" \* \* \*, illustrated in Figures 3 and 5, respectively, of the drawing. \* \* \* [The] method claims \* \* \* read on "applying" the developer composition consisting of a mixture of toners to the surface to be developed by means of the cylindrical drum shown in Figure 3 or the "belt" apparatus in Figure 5 or the bristles of a fur brush as disclosed in column 3, lines 53–65 of the Bixby patent.

The board also found Bixby to disclose mixtures of positively and negatively chargeable toners without particulate carriers:

Bixby then states:

*In general,* resins such as manjak, gilsonite, casein, polymethyl methacrylate and cellulose acetate give up electrons relatively easily, i. e., are easily charged to a *positive* potential triboelectrically. While materials such as Vinsol (a trade name of Hercules Powder Co. for a thermoplastic resin derived from pine wood), dammar, tartaric acid, polyvinyl butyral and various rosin-modified urea-formaldehyde resins easily acquire electrons, i. e., become *negatively* charged triboelectrically. *In black pigments and dyes, it has been found that materials such as manganese dioxide, black iron oxide and Raven Beads carbon black easily acquire a negative charge,* while nigrosine easily acquires a positive charge. *The selection of suitable toner materials can be made by any one skilled in the art from the many materials that have been tested and occupy recognized positions in the triboelectric series.* The dimension of the charge acquired by any particular material through triboelectric contact with any designated material is easily and readily determined as is well known to those skilled in the art. (Emphasis supplied)

Contrary to appellant's arguments, we think that the inorganic manganese dioxide, black iron oxide and carbon black materials disclosed by Bixby would be contemplated by one of ordinary skill in this art not only to be useful as coloring pigments for organic resinous toners, but also to be separately useful as negatively charged inorganic toners per se. Certainly nothing in Bixby suggests that both the positive and negative charge bearing components of his toner mixture must be organic to achieve his purpose. Moreover, as the examiner and board point out, the other references of record, notably Carlson I and II, make it clear that inorganic materials such as talcum, zinc oxide, or carbon black have long been used in the art as toners in their own right.

The record shows that all claims were treated by the Patent Office and appellant below as standing or falling with claims 1 and 10, as we so treat them here. See In re Allen, 324 F.2d 993, 51 CCPA 809.

In view of the above, it is unnecessary to consider the remaining rejections of the claims under 35 USC 112 which were made below.

The decision is affirmed.

Affirmed.

SMITH, Judge (concurring).

The record shows that the Board of Appeals here consisted of an examiner-in-chief and two acting examiners-in-chief. Appellant does not challenge the legality of that board. For the reasons expressed in my dissenting opinion in In re Wiechert, 370 F.2d 927, 54 CCPA 957, the decision of such a board in my view is a legal nullity. However, I must accept the majority's view on this issue in the *Wiechert* case, i. e., the legality of the board is not an issue here. I therefore participate in the merits of this appeal and in so doing, agree with the conclusion of the majority.